## KATHERINE E. BOUNDS

*vs.*

## WILLIAM E. BOUNDS.

*Divorce—Faults of Temper—Abandonment.*

The right to a divorce exists only by legislative grant, the marriage contract in this respect being regulated and controlled by the sovereign power and not being, like ordinary contracts, subject to dissolution by the mutual consent of the contracting parties. p. 223

Mere turbulence of temper, petulance of manners, infirmity of body or mind, are not causes for which a separation may be lawfully decreed. p. 223

When parties enter into the marriage relation they accept each other with all their imperfections, and the law will not dissolve the relation except upon the clearest and most satisfactory proof of the necessity for the dissolution. p. 224

That the wife constantly displayed a quarrelsome disposition does not justify the husband in leaving her, so as to preclude the grant of a divorce in her favor on the ground of abandonment. p. 225

*Decided November 21st, 1919.*

Appeal from the Circuit Court No. 2 of Baltimore City (DOBLER, J.).

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and ADKINS, JJ.

*Francis I. Mooney* and *Forrest Bramble,* for the appellant.

*Horace T. Smith,* with whom were *H. Webster Smith* and *Charles Ruzicka* on the brief, for the appellee.

BURKE, J., delivered the opinion of the Court.

On the 10th day of April, 1913, Katherine E. Bounds, filed a bill of complaint against her husband, William E. Bounds, for a *divorce a mensa et thoro* and for temporary and permanent alimony. The Court, after hearing, passed an order fixing the amount of alimony *pendente lite* at the sum of nine dollars per week. This order was passed on the 16th day of May, 1913, and the husband paid this sum until March, 1919.

The bill charged the husband with cruelty, adultery, nonsupport and desertion. The parties were married on the 23rd of April, 1883, and lived together over twenty-nine years. Six children had been born—three of whom had died, and one of the surviving children was a minor at the time the bill was filed, but has since attained his majority. The answer to the bill denied the allegations which set out the grounds for divorce and alleged that the wife "was forever grumbling and growling, fussing and scolding and ordering him out of her home, and in order to rid herself of him sold the bed on which he slept and he was compelled to sleep on a lounge, find his own covering and the greater part of the time compelled to get his own meals." The answer was filed on the 24th of April, 1913. Except the filing of a petition in April, 1919, for the reduction of alimony *pendente lite,* nothing was done in the case until the 28th day of April, 1919, when the husband filed a cross-bill against his wife for a divorce *a vinculo matrimonii* upon the ground of abandonment. This bill was filed more than six years after the separation of the parties which occurred on the 28th of February, 1913, and which constitutes the desertion charged in the wife's bill.

In the third paragraph of the cross-bill it is alleged: "That on February 28th, 1913, the said William E. Bounds did not desert his wife; but, on the contrary, Katherine E. Bounds then deserted and abandoned him in the City of Baltimore; that such abandonment has continued uninterruptedly for

over three years and was deliberate and final, and the separation of the parties is beyond any reasonable expectation of reconciliation." The Court below, after hearing the testimony, passed a decree on April 27, 1919, dismissing the bill of the wife, and granted the husband an absolute divorce. The appeal before us was taken by the wife from that decree. Before adverting to the facts, it may be well to refer to certain principles of law which must guide us in the disposition of the case. It is said in 9 *R. C. L.,* sec. 11, p. 252, that: "Marriage is a relation in which the public is deeply inter- ested and is subject to proper regulation and control by the State or sovereignty in which it is assumed or exists. The public policy relating to marriage is to foster and protect it, to make it a permanent and public institution, to encourage the parties to live together, and to prevent separation. This policy finds expression in probably every State in this country in legislative enactments designed to prevent the sunder- ing of the marriage ties for slight or trivial causes, or by the agreement of the husband and wife, or in any case except on full and satisfactory proof of such facts as by the Legislature have been declared to be cause for divorce. Such provisions find their justification only in this well-recognized interest of the State in the permanency of the marriage relation. The right to a divorce exists only by legislative grant, the mar- riage contract in this respect being regulated and controlled by the sovereign power, and not being, like ordinary con- tracts, subject to dissolution by the mutual consent of the contracting parties, but only for the causes sanctioned by law. As said by the Federal Supreme Court: 'Other contracts may be modified, restricted, or enlarged, or entirely released upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities. It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of soci- ety, without which there would be neither civilization nor

progress.' " In *Childs* v. *Childs,* 49 Md. 514, our predeces-
sors said (quoting LORD STOWELL in *Evans* v. *Evans,* 2
Hagg. Consist. Rep. 35): " 'The law has said that married
persons shall not be legally separated upon the mere disin-
clination of one or both to cohabit together.' * * * 'That the
duty of cohabitation is released by the cruelty of one of the
parties is admitted, but the question occurs, *what is cruelty?*'
Declining to define the term the learned judge declares: 'It
is the duty of the courts, and therefore the inclination of the
courts, to keep the rule extremely strict. The causes must be
grave and weighty, and such as show an absolute impossibil-
ity that the duties of the married life cannot be discharged.
In a state of personal danger no duties can be discharged, for
the duty of self-preservation must take place before the
duties of marriage, which are secondary both in commence-
ment and in obligation; but what falls short of this is with
great caution to be admitted.' The rule of *"per quod con-
sortium amittitur"* is but an inadequate test, for it still re-
mains to be inquired, what conduct ought to produce that
effect? Whether the *consortium* is reasonably lost and
whether the party quitting has not too hastily abandoned the
*consortium.* The same learned judge in the same opinion
declares, 'Marriage is the most solemn engagement which one
human being can contract with another. It is a contract
formed with a view not only to the benefit of the parties
themselves, but to the benefit of third parties; to the benefit
of their common offspring, and to the moral order of civil
society. To this contract is superadded the sanctity of a
religious vow. * * * There are undoubtedly cases for which
a separation is provided, but it must be lawfully decreed by
public authority and for reasons which the public approves.'

"Mere turbulence of temper, petulance of manners, in-
firmity of body or mind, are not numbered amongst those
causes; when they occur, their effects are to be subdued by
management, if possible, or submitted to with patience; *for
the engagement was to take for better, for worse,* and painful

as the performance of this duty may be, painful as it certainly is in many instances, which exhibit a great deal of misery that clouds human life, it must be attempted to be sweetened by the consciousness of being a duty, and a duty of the very first class and importance.' " When parties enter the marriage relation they accept each other with all their imperfections, and the law will not dissolve the relation except upon the clearest and most satisfactory proof of the necessity for the dissolution. It was said by JUDGE ALVEY, in *Shutt* v. *Shutt,* 71 Md. 193, that "it is quite certain that the courts cannot interfere to furnish relief against all the troubles and distresses that may exist in the matrimonial relation. By far the greater number of these must be left to the good sense and management of the parties themselves. As has been said by a great authority (LORD STOWELL), it is the law of religion, and the law of the country, that the husband is entrusted with authority over his wife. He is to practice tenderness and affection, and obedience is her duty."

The bill filed by the wife was for a decree *a mensa.* The charges of cruelty, non-support and adultery are not supported. The parties were in very moderate and limited circumstances. His trade was that of a carpenter, and while the wife in conducting the household and providing for the children, many times endured hard conditions and the inconvenience of poverty, the testimony is not sufficient to warrant us in holding that the husband failed to support her to the extent that his means permitted. The domestic life of the parties was not happy. There was much contention and many quarrels in the home. This condition was not due alone to the conduct of the wife. He did not do his duty. He owed more to her than mere food and clothing. He did not treat her with proper consideration and does not appear to have had any affection for her. He absented himself from his home, spending his evenings in the society of his friends. He testified that he did not want to marry her, but that his wife held him to his promise, and he speaks of her in his testimony as a "cold proposition." Had his conduct towards

his wife been such as the law required it is reasonably certain that he would not have had so many complaints to make. His wife was exceedingly jealous, due, we think, to marital infidelity on the part of the husband following the birth of their second child, and she was suspicious of his association with other women, and this jealousy and suspicion was the cause of the allegation of adultery as well as most of the disturbance in the home. So far as the testimony relates to the grounds of divorce set up in the two bills it must be found almost exclusively in the evidence of the parties, and upon the material questions is contradictory and uttterly irreconcilable. Practically the only essential facts which are satisfactorily established are that the husband left his wife on the 28th of February, 1913, with the intention of permanently abandoning her and has never since returned. He stated in his evidence the circumstances which induced him to leave, but his testimony is uncorroborated, and his statement that she ordered him out of the house is denied by the wife. We do not find it necessary to recapitulate the evidence. It is largely a recital of the differences between the parties extending over a period of a quarter of a century, and which we believe to have been greatly magnified. There is no charge affecting the moral character of the wife, and, assuming all that the husband has said as to her quarrelsome disposition to be true, her conduct was not such as to justify him in leaving her, and we must treat his act as an unjustifiable act of abandonment and desertion on his part entitling her to the relief prayed for in her bill.

This conclusion, which follows from the application to the facts of the principles of law above stated, results in the reversal of the decree appealed from. The decree will be reversed and the cause remanded in order that decree may be passed dismissing the cross-bill and granting the relief prayed for in the original bill.

*Decree reversed with costs and cause remanded.*