## MARGARET E. CLATTERBUCK *v.* CARL C. CLATTERBUCK.

### *Divorce—Cruelty—Evidence.*

A decree granting a divorce to the husband on the ground of cruelty was erroneous, in view of evidence that the injuries inflicted on him by the wife with a knife were probably accidental or in self-defense, that he had repeatedly, and without justification, accused her of improper relations with men, and that the wife's temper was aggravated by his attentions to, and attempt to seduce, a young girl living with them.

*Decided May 4th, 1926.*

Appeal from the Circuit Court for Washington County, In Equity (WAGAMAN, J.).

Bill for divorce by Carl C. Clatterbuck against Margaret E. Clatterbuck.   From a decree for plaintiff, defendant appeals.   Reversed.

The cause was argued before BOND, C. J., PATTISON, URNER, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*William H. Bovey,* with whom was *Leon R. Yourtee* on the brief, for the appellant.

*D. Angle Wolfinger,* submitting on brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court for Washington County granting a divorce *a mensa et thoro* to Carl C. Clatterbuck, the plaintiff below, from Margaret E. Clatterbuck, his wife. The parties were married on June 15th, 1911, and lived together until July, 1925. He is a brakeman on the Western Maryland Railroad, and his wife kept the home which they owned jointly in Hagerstown. They had no children of their own, but there lived with them a boy, Robert, aged thirteen, whom they had cared for from his infancy, and a girl, May Hoffman, who had been with them for about three years just before this suit.

They appear to have lived together without serious difficulty until early in 1925, when their relations became strained and hostile and, on August 19th, 1925, the husband filed the bill in this case, in which he charged that his wife had abused, stabbed, cut, beat, cursed and mistreated him and threatened his life, at the same time and in the usual form protesting his own marital affection, kindness, and chastity. His wife in her answer not only denied her alleged cruelty and brutality towards him, but also denied that his treatment of her had been either kind, affectionate, or chaste, but said that, although she only weighed one hundred and ten pounds, the plaintiff, who weighs two hundred and twenty-five pounds, had repeatedly thrown her down, beaten her, threatened to kill her with a razor and a shot gun, and otherwise treated her with cruelty, harshness and brutality.

The testimony taken in connection with these conflicting allegations bristles with allusions to guns, knives, assaults, violence, and brawls, and in it each party tells with heartfelt fervor of the misconduct of the other, but after a careful examination of all of it, we can not agree with the con-

clusion of the learned chancellor who tried the case, that the plaintiff was entitled to a divorce. It may be that for the weal of the parties that would be the best disposition of the case, but we do not think it can be reached without unsettling long established legal principles, and we are unwilling to do that. The specific acts of cruelty upon which the appellee relies are thus stated by him in his testimony: He said that in March 1925 he and his wife quarreled about household funds and that she locked him in his room and when he asked to be let out, she said, thirty-five dollars, you ——————, before you come out"; that on another occasion she threw an ice pick at him and as he was leaving the house told him she hoped he would come home in pieces; that later on, about the 28th of May, he came home and found the house locked, but he got in and found his wife getting supper; that she abused him and when he saw there was "no getting supper" he started to go away, and that she then grabbed "the butcher knife" and ran it into his pocket and that he grabbed it and was cut, and that the next morning he was told that she was coming with a shot gun and he left over the back fence; that on a still later occasion, when he accidently broke something connected with his wife's carpet sweeper, she said that if he broke her things she would break his, and that he should not keep a gun, and started "on back," and to quote him:—"I pulled her down and she grabbed the door and got the key to my door and locked me in the room and I got it from her and then is when she got the knife and stabbed me in the leg. Q. What knife did she take? A. This is the blade. Q. Where did she stab you? A. Just about there (indicates). Q. Did she stab you deep with the knife? A. Clear to the bone; it numbed me all up my side; the whole side was numb. Q. What did you do then? A. I grabbed her by each arm like this; I picked her right straight up and rammed her head down on the floor; I said, 'Robert, take the knife away,' and he took the knife away; he shut the knife and gave it to me. I went in the room and she went in her room and I got the

two guns and I brought them down and fixed the carpet
sweeper; and I told May, 'You go ahead and finish sweep-
ing, because this is the last.' " He admitted that he fre-
quently accused his wife of improper relations with other
men, although he referred to no fact to warrant the charge
except a letter, which he said his sister found, to some man
not named in it, and he said that she confessed her unfaith-
fulness when confronted with the letter, but that he forgave
her; he also testified that she often said that if she had a
gun she would blow out her brains and his too.

Mrs. Clatterbuck in her testimony admitted that she had
cut her husband on the two occasions referred to by him, but
said that on the first occasion: "He taken his car and took a
bunch of people away and wouldn't leave any money in the
house to pay the bills, and I asked him if he was going to
give me any money and he said, no, he would see me in hell
before he would, and I made a grab for his pocketbook and I
told Mr. Bowers about that, and he made a grab for the
knife. Q. You were cutting bread at the time? A. I was
cutting bread for supper, that is the way I had a butcher
knife in my hand and he reached and grabbed the knife. Q.
You mean he reached for you and his fingers caught the
knife? A. Yes, just grabbed like that (indicates)." And
referring to the occasion when she cut him in the leg with a
penknife she said: "Q. The day that you cut him in the
leg where did you get the knife? A. Yes, I admit I cut him
in the leg with a knife; on his washstand. Q. Why did you
get it? A. He came up and grabbed me and I reached back
and got that knife. Q. What did you want up there? A. I
wanted to break up something that belonged to him, for he
broke my sweeper. Q. What did you want to break up? A.
His old gun and fishing rod. Q. Where did you get the
knife? A. On his washstand. Q. Why did you get it? A. To
hit him with it, after he grabbed me. Q. Then you grabbed
the knife? A. Yes, it was open. Q. Didn't you grab the
knife when you first went in the room? A. No, sir. Q. What
did you want to break his gun up for? A. Because he broke
my sweeper. He twisted my arm back clear back under me

and I stabbed him in the leg. Then he run right down to the doctor. I done that in self-defense." She also testified that he had repeatedly accused her of "being with men," that he threatened to shoot her and cut her throat, and that he beat and abused her. She further said that he had tried to seduce the child May Hoffman, and told her he wanted her more than he did his wife. She denied intimacy with other men and denied the existence of the letter referred to by the plaintiff.

Aside from the admitted fact that he was cut on the two occasions referred to, there is no corroboration of Clatterbuck's testimony, except that the boy Robert said that on one occasion the appellant said that she was going to get a gun, although he did not know that she did get it, nor did he hear her say what she intended to do with it.

May Hoffman, called as a witness by appellee, gave a description of the circumstances surrounding the struggle in which the appellee was cut in the leg, which differs from that given by him. She said: "She was sweeping the room and it was raining, and Mr. Clatterbuck had gone on the front porch and he came back in and she said, 'Shut the door,' and the cord caught and jerked the sweeper like and broke it, and she said, 'If you are going to break up things of mine I will break yours,' and she went upstairs in his room, and there was a little penknife laying on the dresser, and whenever Mr. Clatterbuck came up the stairs she grabbed this penknife, and he took hold of her and twisted her arm back of her back, and she told him to let her loose, and he wouldn't do it, and he told Robert to take the penknife and Robert took it and gave it to Mr. Clatterbuck."

This testimony, which is all that is material, is not sufficient to establish the burden which the appellee assumed. On the other hand it is difficult to escape the conviction that Clatterback had attempted to seduce the girl May Hoffman, and that his evil purpose was frustrated only by the child's own decency and his wife's vigilance. Mrs. Clatterbuck and the girl testified to that fact and Robert heard him say that he "liked May better than either of us." Robert also testi-

fied that he had heard Clatterbuck several times threaten to kill his wife and himself.

Although from the plaintiff's own testimony, Dr. Kritzer and plaintiff's sister could have corroborated at least parts of his testimony, neither was called.

This testimony is in our judgment wholly insufficient to meet the burden which rested upon the appellee to establish the allegation of his bill.

The incidents of physical violence upon which he mainly relied in his bill of complaint to establish the charge of cruelty, upon which his right to relief rests, are either not proved at all, or, if proved, the weight of the evidence indicates that they occurred under circumstances which deprive them of the sinister significance which he attributes to them. For instance, he charged in his bill that his wife "drew a shot gun on him and threatened to kill him," but neither the appellee nor any of his witnesses testified that appellant was ever in possession of a gun in his presence. He also charged that she stabbed him in the leg with a "hunting knife," but the evidence, his own included, shows that what happened was this: He had followed his wife into his room after a violent altercation, and she grabbed a "little penknife" from "the dresser," that he then grabbed her arm, twisted it behind her and threw her on the floor, and that she cut him in the leg while he was holding her in that painful position. He charged, too, that she had intentionally cut his hands with a butcher knife, but the evidence rather tends to support her story, which was that she was cutting bread with the knife when she asked him, as he was about to leave, to leave money to pay some household bills, and he said he would see her in h—— first," and that she then with the knife in her hand grabbed for his pocket book, and he at the same time grabbed the knife and cut his fingers.

The testimony indeed draws a wretched and pathetic picture of domestic discord and violence, but much of it must be attributed to the conduct of the appellee himself, and we do not feel, in the light of all the testimony, that the wife was any more at fault than he was.

The parties are people in moderate circumstances, and with the exception of occasional quarrels, such as not infrequently enliven domestic relations, they lived, if not altogether happily, at least quietly, until Clatterbuck began his offensive attentions to the child, May Hoffman, in 1925. That his wife, who was deaf, had a violent temper, no doubt aggravated by her infirmity, cannot be denied, but the appellee married her for better or worse, and he at least will not be heard in a court of equity to complain of outbreaks due to a natural and justifiable indignation which he excited and provoked by his own wrongful conduct, and the decision in this case may well rest upon the reasoning of this Court, speaking through Judge Burke in *Bounds v. Bounds,* 135 Md. 224, where it is said: "The domestic life of the parties was not happy. There was much contention and many quarrels in the home. This condition was not due alone to the conduct of the wife. He did not do his duty. He owed more to her than mere food and clothing. He did not treat her with proper consideration and does not appear to have had any affection for her * * *. Had his conduct towards his wife been such as the law required it is reasonably certain that he would not have had so many complaints to make."

From what has been said it follows that in our opinion the decree appealed from should be reversed, and the bill dismissed.

*Decree reversed, and bill dismissed with costs.*