## ROBERT S. MARTIN *v.* NANCY H. MARTIN.
### [No. 22, January Term, 1930.]

*Decided April 9th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and SLOAN, JJ.

*Webster S. Blades,* with whom were *Charles J. Butler, Julius Novey,* and *Blades, Rosenfeld & Frederick* on the brief, for the appellant.

*Arthur U. Hooper,* for the appellee.

SLOAN, J., delivered the opinion of the Court.

This is an appeal of the husband from a decree by which the wife was granted a divorce *a mensa et thoro,* the custody of their children, and alimony. The charge is "that for some years past the said Robert S. Martin (the appellant), her husband, has treated her (the appellee) with great cruelty, harshness and brutality, and that upon several occasions the said defendant has struck and beat her, and in particular that on May 5, 1929, he did threaten to strike and beat her and did use such rough and cruel physical force upon her that she was compelled to leave their home and seek protection from his violence; that your oratrix is prevented from returning to her usual place of abode by fear for the safety of herself and children and has taken refuge with her mother and sister."

The facts leading up to the separation as testified to by the appellee are as follows: "On May 4th my husband had been away for a long time and the landlady had been to the house several times for the rent and the 'phone was going to be cut off and the grocery bill had been running for six weeks and I was without any money and I had no credit any place and he was down with his mother and had been working for his mother, and that was Friday and he was still there and I wrote to him to come home that I needed him, and he came home Saturday night and he had been drinking and got home late from the boat and the first thing he demanded was his

title. Saturday morning, a title to an automobile came, a Buick coupé which he had for several weeks, and I knew nothing about, and he demanded the title and I said I would give him the title when he paid the rent and the grocery bill and he got into a rage about that as he always did when I stood up for anything and demanded the title and I said, 'I will give you the title when you calm down—why did you buy a car this time and I not know anything about it?', and he said it was none of my business whether he had a car or not, that I wouldn't see the car, that it was a present to him from his mother and he got very abusive to me and towering over me and I begun to get dreadfully frightened and I said, 'If you will sit down I will get the title,' and he slung me across the room and I fell on the floor, and of course I was so frightened I gave him the title and he went out."

To the question, "Was this an unusual occurrence?" the appellee said: "This was a very mild occurrence to what 'happened on several occasions." A neighbor living in the adjoining apartment testified that she "heard an awful noise like a table going over and I heard a scream."

The next morning the appellee got her hat and coat which he took away from her. She got others and ran to her mother, who lived nearby, and never came back while the appellant was there. She, her mother, and sister now live in the house which the appellee abandoned, she having taken a lease. Two days later the appellee and her sister came for the children. The appellant let them have the younger girl, aged six, and he took the older one, aged eleven, with him to Easton, where they remained until he took her to the State Encampment at Camp Ritchie. There the appellee went with her sister and secured the child from the appellant. Asked what she said at that time about returning to her husband, she answered: "I said if he gave up drinking and his bad companions and tried to make a living for his child then it would be time to think about coming back." "I had no idea of going back. I tried it before. This wasn't the first time I left." The record does not show how long before, but she remained away one year. Asked "What's your objec-

tions to him—his drinking", she answered, "Yes." Of the visit to the state camp the appellant said: "I asked my wife if we could get ourselves straightened out and go back together again, and she cried a little and said she thought if I did certain things"—give up the Guard and quit drinking— "She said if I would do both these things and go to making enough money she would talk about it then." At any rate she got the child and he resigned his commission. Whether he stopped drinking the record does not disclose.

The appellant admitted that they had had an argument about the automobile title; that he took hold of her arm, "didn't do it especially gently, but didn't throw her down or smack her." He said he had not struck his wife or done any violence to her since they lived at Easton in 1922. "I promised her the last time I would not do it again."

Whether a single act of violence may constitute a valid ground of divorce *a mensa* "depends upon whether such single act indicates an intention to do serious bodily harm or is of such a character as to threaten serious danger in the future." *Hastings v. Hastings,* 147 Md. 177, 181. But the testimony is not confined to one experience, but to a course of conduct which seems to have manifested itself on nights the appellant returned from drill, usually showing the effects of intoxicants, in which it was his habit, as he admits, to imbibe too freely on such occasions.

While drunkenness is one of the chief causes of domestic unhappiness and discord, it is not a sufficient reason for one spouse to abandon the other unless it leads to physical violence or injury to the health, or causes the court to apprehend that such results may follow the continuance of such conduct. *Shutt v. Shutt,* 71 Md. 193. "Where from evidence of hatred, malice, high temper, violent conduct, habits of intoxication and lack of self-control, the court apprehends that injury to the plaintiff's health will follow, then it will interfere. Where violence has been inflicted and threats are made, the court should not hesitate to interfere, as the past, when considered with the attitude of the defendant, makes it clear that the violence will be repeated." *Sharp v. Sharp,* 105

Md. 581, 584, quoting *Nelson on Marriage and Divorce,* 293; *Hawkins v. Hawkins,* 65 Md. 104.

The inference we draw from the whole evidence is that the physical violence complained of is the result of the appellant's propensity to drink intoxicants, which he thinks he handles with moderation and discretion. That may be his opinion, but it is apparent that under the inspiration of a few drinks he is entirely too free in the use of his hands, as the immediate cause of the separation shows. It came to the point where the wife made up her mind she would not put up with it any longer. The decisions do not show just how many beatings a wife must take before she is justified in leaving her husband, but in this case there were repeated acts diffused over many years (*Hawkins v. Hawkins,* 65 Md. 104, 112), without any indications that the appellee would not be exposed to danger of bodily harm every time the appellant had a few drinks. Under the circumstances herein recited the appellee was justified in the belief that her safety required her to seek shelter elsewhere. The decree granting the appellee a divorce *a mensa et thoro,* the custody of the children, and alimony of fifty dollars a month and counsel fees, will be affirmed.

*Decree affirmed, with costs.*