## LENA GELLAR *v.* MAX GELLAR.
[No. 26, April Term, 1930.]

*Decided June 10th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Eldridge Hood Young* and *Harry T. Kellman,* for the appellant.

*Joseph W. Spector,* for the appellee.

DIGGES, J., delivered the opinion of the Court.

On June 26th, 1929, the appellant (wife) filed in the Circuit Court No. 2 of Baltimore City her bill of complaint against the appellee (husband), in which she prayed for a divorce *a mensa et thoro,* alimony *pendente lite* and permanent, and counsel fees. There was also a prayer asking that a receiver be appointed to take charge of the premises known as No. 2910 Ulman Avenue, with authority to sell same and have the proceeds thereof brought into court for proper distribution. The bill alleges that the parties were married on November 3rd, 1917, and lived together until the latter part of May, 1929; that the husband, for some time prior to the filing of the bill, had treated the wife with great cruelty, harshness, and brutality, at times striking and beating her; that on or about May 12th, 1929, his conduct became so intolerable that she was compelled to have him arrested for assaulting her and her sister, who was visiting her home at that time, and as a result of which the appellee was duly fined for the assault in the Northwestern Police Station in the City of Baltimore; that the husband moved all his belongings in a certain room of their home on Ulman Avenue, separate from the room occupied by her, and caused the same to be securely locked, refusing her permission to live with him; that the appellee refused to pay the necessary expenses for the upkeep and maintenance of the home, or pay for the coal, electric and gas bills, necessary for the

comfort of the wife, and acted towards her in such a ferocious manner that she was in constant fear that he would do her severe bodily harm; that on or about the 28th of May, 1929, as a result of said cruel treatment, she was compelled to move from their home on Ulman Avenue which the parties held as tenants by the entirety. The husband filed an answer denying all of the material allegations of the bill, and also filed a cross-bill asking for a divorce *a mensa et thoro* against his wife on the ground of desertion. The chancellor denied the relief asked for by the wife, and dismissed her bill of complaint; but on the contrary found that she had, without just cause, deserted her husband, and passed a decree for divorce *a mensa et thoro* in favor of the husband and against the wife, in accordance with the prayer in the cross-bill of the husband. It is from this decree the appeal here is prosecuted.

The testimony shows that each of the parties had a child or children as the result of former marriage; that a daughter of the wife by a former marriage was, together with her husband and infant child, living with her mother and stepfather at the Ulman Avenue home; that some time prior to April 16th, 1929, the parties hereto had complaints and disagreements, arising principally, on the wife's part, out of the husband's failure to supply such a sum of money as the wife thought was necessary for her support and the upkeep of the home, and, on the husband's, by reason of his opposition to having his stepdaughter, her husband and child, as inmates of the home, and also opposition to a sister of his wife spending week-ends there. There was also complaint on his part because of the failure of the wife to provide and serve meals at such times as would enable him to properly attend to the duties of his employment. These disagreements culminated in the wife filing a bill for divorce *a mensa et thoro,* which proceeding was considered by Judge Frank, the chancellor who also heard the case now before us, and resulted, on April 16th, 1929, in the dismissal of the wife's bill, with the admonition to the husband that he contribute more money to the upkeep of the home. The kindly offices of the chancellor

seem not to have been productive of beneficial results, for almost immediately upon their return home the previous bickering and wrangling was renewed, the wife wanting more money and the husband insisting that the wife's relatives must remove and stay away from the Ulman Avenue house. During this time the parties were occupying separate bedrooms, with apparently no effort made by either to harmonize their differences and effect a genuine reconciliation. At this time the wife's daughter was in the hospital and was visited by the wife every day, practically from the time she arose in the morning, about 10 o'clock, until after the husband had returned from his work in the evening. She would provide no breakfast for him, which necessitated his getting it away from home; the evening meal was prepared by the wife or a servant, and left for the husband upon his return at night. The wife's sister had testified at the hearing of the previous divorce suit against the husband, and she continued to come to the Ulman Avenue home on Saturdays, spend the night, and leave Sunday evening. This sister spent Saturday night, May 11th, at the home, but did not see the appellee until Sunday morning, at which time he upbraided her for being there and ordered her to leave. An altercation ensued, participated in by the wife, her sister, her son-in-law, and the appellee. The testimony on behalf of the wife is that the husband assaulted both herself and her sister. This is denied by the husband, but it is a fact that he was arrested and fined for an assault upon the wife's sister. This is the only act of physical violence towards the wife alleged or attempted to be proved. Shortly after this occurrence, the son-in-law began preparations to leave the Ulman Avenue home; and when he moved, on May 28th, his mother-in-law, the appellant, went with him. The record discloses that she claimed most of the personal property in the home, and between May 12th and the time of her departure she had removed all of the house furnishings, leaving the home practically bare. When she left she did not advise her husband that she intended to go, and left no message as to her whereabouts.

The two questions presented are: First, did the conduct of the husband constitute such "cruelty" as under our divorce laws would justify the wife in leaving the home; and, if this be answered in the negative, second, was the abandonment by the wife such as would entitled the husband to a divorce against her? In the recent case of *Short v. Short,* 151 Md. 444, we said: "Legal cruelty must be such conduct on the part of the husband as will endanger the life, person, or health of the wife, or will cause reasonable apprehension of bodily suffering. It should be of such a nature as to render cohabitation physically unsafe to a degree justifying a refusal to continue it. Marital neglect, indifference, a failure to provide as freely as the wife may desire in dress or in conveniences, sallies of passion, harshness, rudeness, and the use of profane and abusive language towards her, are not sufficient, if not in manner and degree endangering her personal security or health." *Childs v. Childs,* 49 Md. 514; *Hawkins v. Hawkins,* 65 Md. 108; *Bounds v. Bounds,* 135 Md. 220; *Schwartz v. Schwartz,* 158 Md. 80, 148 Atl. 259. While "cruelty," as contained in the divorce statutes of this state, has been often defined by decisions of this court, and clearly stated by Judge Parke in *Short v. Short, supra,* the difficulty arises in applying the definition to the facts of each particular case. Necessarily, it seldom occurs that the facts in two cases coming before this court for decision are identical, and therefore no hard and fast rule can properly be enunciated.

It was said by Judge Bartol, in *Levering v. Levering,* 16 Md. 213, decided in 1860, that "there is no more painful and delicate duty devolved on a court of justice, than that of pronouncing upon the causes which justify a severance of the marriage relation. Public policy and public morals, alike, require that a relation so intimate and tender should not be broken for slight or trivial causes, and impose on us the duty of carefully weighing and considering the grounds upon which we are called on to affirm a decree dissolving the bonds of matrimony, between parties who respectively claim and resist the exercise of the power conferred on us by law." The responsibility, delicacy, and difficulty of that duty has been

enlarged rather than diminished since that pronouncement. This may with truth be said to be due in part to the present day attitude of the public towards divorced persons. Formerly the state of the public mind was such that the offending spouse in a divorce proceeding was the subject of social ostracism, and even the innocent one was under suspicion of not having fully lived up to the promises made in the marriage ceremony. While this indifference, or what might be termed liberal attitude, on the part of the public now prevails, the law of the State remains substantially as it was at the time Judge Bartol used the language above quoted; and it may be that individuals who constitute the public have lost sight of what the courts are bound to recognize, that the State, representing society as a whole, has a real and vital interest in maintaining the marital status, so that it may not be dissolved except for grave and weighty causes. This would seem to apply with even greater force to application for divorce *a mensa et thoro*, which is practically nothing more than a request for judicial permission to live separate and apart, and which must result in the condition described by an eminent judge, of throwing the parties back upon society in the indefinite and dangerous character of "a wife without a husband and a husband without a wife."

Applying these principles to the wife's bill for divorce on the ground of cruelty, we are in accord with the conclusion reached by the chancellor, to the effect that the record does not disclose actions on the part of the husband towards the wife such as constitute legal cruelty. It is evident that the presence in the home of the wife's daughter and son-in-law was highly objectionable to the husband; and this was apparent to the wife, who seemingly had determined to live in the house with her husband only so long as her relatives remained. There was continual wrangling and quarreling, crimination and recrimination, indulged in by the husband and wife, participated in, or at least encouraged on her part, by her sister. As a result of this condition, it is shown by testimony on behalf of the wife that on one occasion he struck the sister, and is alleged to have hit the wife and her son-in-

law. There is no testimony indicating personal violence at any other time, and we are not prepared to say that, even if the blow was actually inflicted, it was not occasioned by the general melée shown to have taken place at that time, or was with any specific intent on the part of the husband to do personal injury to his wife. This view is strengthened by the fact that he was convicted only of assault upon his sister-in-law. The cause of the trouble at that time was evidently the presence of the wife's sister in the home, over the objection of the husband and his demand that she leave. Assuming the testimony on behalf of the wife to be true, a single blow, administered under such circumstances, does not constitute legal cruelty on the part of the husband for which the wife may obtain a divorce. *Hastings v. Hastings,* 147 Md. 177.

We come now to the question of whether the departure of the wife from the Ulman Avenue home and taking up her abode with her son-in-law constitutes desertion by her. Desertion, as a matrimonial offense, is defined to be the voluntary seperation of one of the married parties from the other, or refusal to renew suspended cohabitation without justification either in the consent or wrongful conduct of the other party. *Klein v. Klein,* 146 Md. 27, and cases there cited. There is no dispute that the wife left the matrimonial domicile, and it is clear that she did so with the intent to sever the marital relation. She left without any notice of her prior intention to do so, or where she had gone. This was followed up very shortly by the filing of her bill for divorce on the ground of cruelty. This intention on her part is further shown by her testimony at the trial of this case, as follows: "(The Court): Listen to what I say. If he (the husband) had wanted to live with you and behaved himself, you told him to behave himself, and if he had behaved himself, would you have been willing to live with him? (The witness): I could not take his words, he would do all the time the same. Q. (By Mr. Kellman): Mrs. Gellar, his Honor asked you, if your husband had behaved himself and

treated you as a husband should treat you, would you want to live with him? (The Witness): No, sir; I could not live with him." This is in striking contrast with the attitude of the husband, as indicated by his testimony: "Q. And you do want to live with your wife, is that it? A. Yes sir; I want to live with her now if she brings back the furniture and everything. Q. And if she wouldn't bring the furniture you don't want her, is that it? A. Yes, sir, if she wants to stay with me in two rooms. I have no money for other furniture." The above answers were given after it had been shown that the wife, upon leaving, had stripped the house of all fixtures and moved all of the furniture.

This court has frequently stated that where testimony is taken in open court and the chancellor has the benefit of the atmosphere of the case, his findings of fact should not lightly be disturbed. This rule is peculiarly applicable to the present case. The learned chancellor here had heard the testimony in two cases where the wife had applied for divorce at short intervals, saw and heard the witnesses, and became acquainted with their demeanor and manner of testifying At the end of the testimony in the first case the chancellor determined that it was proper to try to have the husband and wife reconcile their differences and live in marital harmony. Failing of success, when they appeared before him in the second case he found as a fact that the wife had without cause deserted her husband. We agree with that finding.

*Decree affirmed, with costs to the appellee.*