## CHARLES A. PORTER *v.* ELSIE M. PORTER.
[No. 5, January Term, 1935.]

*Decided March 6th, 1935.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, SHEHAN, and JOHNSON, JJ.

*Simon E. Sobeloff,* with whom were *George Henderson, Elmer J. Carter,* and *Wm. Taft Feldman,* on the brief, for the appellant.

*Charles Z. Heskett,* with whom was *David A. Robb* on the brief, for the appellee.

SHEHAN, J., delivered the opinion of the Court.

This is a suit for divorce *a mensa et thoro,* brought by Elsie M. Porter, the appellee, against her husband, Charles A. Porter, the appellant. A final decree was passed whereby a divorce *a mensa et thoro* was granted to the appellee, and the custody of their child, Gail Porter, was awarded to the mother. Other relief was granted, as prayed in the bill. From this decree the defendant, Charles A. Porter, appealed.

The parties to this suit were married on May 3rd, 1923, and resided together in Cumberland, Md., until about the 1st of September, 1933. There was one child, Gail Porter, born to them, who at the time of the institution of this suit was seven years of age.

The bill of complaint was filed on the 14th day of September, 1933. In the bill there are allegations of great cruelty, harshness, and brutality. It is charged that at times the appellant struck the appellee, and by threats put her in fear of her life, and his conduct became so intolerable that she could no longer live with him, in safety to herself and to their child.

The title to the property in which they lived is in dispute, and the suit relative thereto is on appeal in this court. It is alleged that in addition to his cruelty, threats, and violence, defendant had lately been removing much of the furnishings from the home. Upon her return from a trip with her daughter, she found other furniture packed and ready for removal from the home, and that articles of furniture, including rugs, pottery, most of the table silver, and the clothing of her husband, had been carried away.

The complainant alleges that she has been faithful, affectionate, and chaste, and her conduct above reproach. Allegations relating to the financial condition of the defendant, his earnings, her lack of means with which to support and maintain herself and their child, are set forth with some particularity in the bill. She charges that, by reason of the threats made by her husband against her, she is fearful for the life of herself and her child, if he be allowed to come to her home after the filing of her suit.

The bill then prays for a divorce *a mensa et thoro,* for the guardianship of the infant child, Gail Porter, for permanent alimony, alimony *pendente lite,* counsel fees, and also prays that the furnishings which have been removed from their home be returned, and that her husband be restrained from going to her home or interfering with her or her child in their manner of living, and for general relief.

The suit was filed in Allegany County, and a preliminary order was passed thereon allowing alimony *pendente lite,* counsel fees, and restraining the defendant from interfering with the plaintiff and the infant child, Gail Porter, and awarding the custody of the child to her mother. The defendant filed an answer denying all the essential allegations of the bill of complaint, especially those relating to his misconduct and cruelty.

A voluminous amount of testimony was taken, and on the 28th day of May, 1934, a decree was passed by the Circuit Court for Allegany County, in equity, in which a divorce *a mensa et thoro* was granted to the plaintiff from the defendant, permanent alimony was allowed to her, and the permanent guardianship and custody of Gail Porter was awarded to the mother, who was charged with the maintenance and support of said infant child, with certain rights of visitation to the father, and the jurisdiction of the court was retained as to such alimony, and the custody, maintenance, and support of the infant child. From this decree the appeal in this case is taken.

In view of the fact that the parties are now separated and living apart from each other, so much of the decree as awards the permanent guardanship and custody of the child Gail Porter to her mother is affirmed, and a reasonable sum should be allowed for the support, maintenance, and education of the child, payable to Elsie M. Porter, her permanent guardian and custodian. The welfare and happiness of the child requires this disposition to be made of her custody, support, and maintenance. She is the innocent victim of circumstances entirely beyond her control, and her well-being is of first consideration in this suit. Her age, sex, education, and mother's parental care, together with the probable embarrassment and humiliation that she may suffer because of the differences that have arisen between her father and her mother, doubtless have been given the most careful consideration by the chancellor, and it is our opinion that the decree dealing with this part of the case be affirmed. There remains for our consideration the question of whether the chancellor erred in granting a divorce *a mensa et thoro* to Mrs. Porter, and in awarding alimony to her.

The conduct of the parties to this case towards each other, as detailed by the testimony, is difficult of comprehension. At times they were apparently kind and congenial. They took many long trips together, especially before the child was born, after which event Mrs. Porter's presence was required at home to a much greater extent than formerly. She was helpful to him in his business affairs, and on many of these trips aided him in examining and checking accounts, and at times he was most generous with her. She dutifully cared for him when he was sick with diabetes, and the home was exceptionally well kept. They lived together for about ten years. In certain parts of the testimony there is no serious conflict, but in most instances, especially where the evidence is of greater importance, there are hopeless contradictions and some recriminations. Mr. Porter seems to have been an eccentric man, lacking a true sense of proportions, and certainly this is the case in his deal-

ings with his wife generally, and especially relating to the manner in which he treated her with regard to their financial affairs. He limited her and their daughter to twenty-five dollars a week for expenses during their trip or vacation to Ocean City. On the other hand he gave her a diamond ring that cost more than $1,000 and a bracelet that cost over $400. In some instances he seems to have been selfish and penurious; in others his generosity extended to lavishness. At times he was exceedingly kind; at others harsh, and, according to her testimony, unusually cruel. He afforded her a pretentious home, equipped with beautiful and costly furnishings of all kinds, yet he permitted her to do the drudgery naturally incident to an establishment of such proportions.

He occupied a position of importance and responsibility in his city and apparently had friends of high standing in the place in which they lived; yet he brought Mrs. Porter to Cumberland before they were married and they lived together. Later she was subjected to the chagrin of being named corespondent in a divorce suit brought against him by a former wife, and, after having been divorced, and after paying a substantial sum of money to his former wife, he married the appellee. Nevertheless, she apparently was a complacent party to all of this. After they were married, and during a period of six or eight months, he manifested kindness and consideration towards her, but differences arose and then, it is charged, he treated her with indignity, contempt, and cruelties.

At a card party he seized her by the ankle and pulled her leg up on the table. This was done in the presence of Mr. and Mrs. Rosenmerkle, who were her friends and associates. This seems to have been the result of her having accused him of cheating at cards and refusing to longer play with him. This led to an altercation. He pinched and bruised her. She kicked him, and she testified he slapped her in the face. These incidents are corroborated by Mr. and Mrs. Rosenmerkle, but this seems to be the one act of violence that has substantial

corroboration. At times he used cruel and harsh words to her, but on the other hand she called him names as vile as tongue could utter.

Upon one occasion she started to leave him, and, judging from some of the testimony in the case, it would be supposed that he would have welcomed such a movement upon her part; however, he followed her to the railroad station and apparently a reconciliation took place; at least she returned to live with him.

She testified that he spat in her face. This is certainly the greatest and most depraved gesture of contempt, but there is no corroboration of this act. She testified that he kicked her. He says this was a playful demonstration which he did when his shoe was off and she happened to pass him in the room. She testified that he beat and bruised her, thus showing his brutality. He denies this, and there is no substantial corroboration of it, except upon the one occasion above referred to. She avers that he cursed her and told her to leave, thus showing his lack of affection. This he denies, but it is shown by a credible witness that she had stated in substance that she would divorce him and she was going to "trim" him. There was an occasion when he pursued her to the bathroom and undertook to break the door, and raised his arm in a threatening attitude. Upon this occasion Mrs. Porter's sister was in the house. She interfered, and no assault was then committed. Mr. Porter's answer to this accusation is that he was afraid that she would do violence to herself, because of her extreme nervousness.

There are two notes or letters relied upon to some extent by the appellee in the presentation of her case. On December 19th, 1931, Mr. Porter wrote and delivered this letter to his wife: "To Whom It May Concern: I, the undersigned, took Maude Leroy and another chorus girl to dinner at the Waldorf Astoria, New York, about five years ago and then to her room at her hotel on 72nd Street or thereabouts, and purchased two mandarin coats and scarves. I believe that the door was open all the time I was there. I also picked up an unknown girl

on a mountain about midnight last night and I gave her a ride to Frostburg and left her at the gas station." On the same date he wrote her: "I am perfectly willing for my wife to go wherever she wishes, and with whom she wishes." These communications are signed, "C. A. Porter."

It will be observed that the letters were dated nearly two years prior to the bringing of the suit, and the incident in New York happened five years before the writing of the letters. The remoteness of this incident, and the time between the obtaining of this information and the bringing of her suit is rather conclusive that the suit was not influenced by or based upon the information contained in these letters. The letters seem to have been written in a spirit of pique, and at the time of a quarrel, because Mr. Porter had picked up a young woman on the road and carried her to Frostburg. Under all the circumstances, these letters do not have considerable bearing upon the case, and are not directly corroborative of any of the more important charges, either in the bill or in the testimony of Mrs. Porter.

There is evidence of other disputes and contentions, and lack of consideration, throughout the record. They serve to show the nature of the differences arising from time to time, but the parties lived together under these conditions for many years, and neither observed the duties imposed upon them to bear and forbear. The husband apparently was eccentric; the wife was of a nervous temperament, which multiplied their difficulties; but, taken as a whole, we believe that their relations and conduct towards each other were not such as to entitle Mrs. Porter to a divorce *a mensa et thoro*.

The corroboration of the appellee's testimony is not satisfactory. The testimony of Mrs. Rosenmerkle does not afford substantial corroboration on the more important facts, except as to one incident. She had been a trained nurse in the home, to whom Mrs. Porter became attached, and she was equally attached to Mrs. Porter. They became associates, and evidently close friends. They

took trips or vacations together, and their associations were very intimate; so much so, it is thought, that her testimony would be favorable to Mrs. Porter and should be carefully weighed. Mr. Porter, as testified to by him, believes that the principal reason for the differences between himself and his wife were caused by Mrs. Rosenmerkle's influence, and that except for her they could have reconciled their differences. One might go on indefinitely analyzing the testimony contained in this voluminous record, but always arriving at the same conclusions, and these conclusions would be that there were sallies of passion, harshness, rudeness, and at times marital neglect and indifference, but such conduct, however deplorable, is insufficient to entitle a person to a divorce *a mensa et thoro*. *Short v. Short*, 151 Md. 444, 135 A. 176; *McKane v. McKane*, 152 Md. 515, 516, 137 A. 288; *Wendel v. Wendel*, 154 Md. 11, 21, 139 A. 573; *Gellar v. Gellar*, 159 Md. 236, 240, 150 A. 717; *Singewald v. Singewald*, 165 Md. 136, 166 A. 441; and this is more strongly affirmed in the case of *Hillwood v. Hillwood*, 159 Md. 167, 169, 150 A. 286, 289: "Marriage imposes upon husband and wife the duty to bear and forbear. Marital neglect, indifference, sallies of passion, harshness and the use of vulgar and abusive language, and occasional acts of violence of no serious nature, have been repeatedly declared insufficient to justify an abandonment." The facts in this case measure up to this definition, but do not go beyond it; consequently, the evidence is not sufficient to justify a divorce *a mensa et thoro*, because not disclosing a situation to endanger personal security or health. *Wendel v. Wendel*, 154 Md. 11, 21, 139 A. 573, and cases therein cited.

The testimony in this case does not go beyond these established rules. The single act of violence of which there is corroboration seems to have occasioned no serious results. A single act of violence, even though corroborated, will ordinarily not afford grounds for a divorce *a mensa et thoro*, unless the act indicates an intention of doing serious bodily harm, or is of a character to cause a

reasonable apprehension of serious danger in the future. *Hastings v. Hastings,* 147 Md. 177, 127 A. 743; *Martin v. Martin,* 159 Md. 46, 49, 149 A. 616.

There is no satisfactory evidence that danger to the life, person, or health of the appellee has been caused by any cruelty upon the part of the appellant; neither does it appear that there was reasonable ground for fear there would be such results by their continuing to live together. *Bounds v. Bounds,* 135 Md. 220, 108 A. 870; *Short v. Short,* 151 Md. 444, 135 A. 176; *McKane v. McKane,* 152 Md. 515, 516, 137 A. 288; *Wendel v. Wendel,* 154 Md. 11, 21, 139 A. 573; *Gellar v. Gellar,* 159 Md. 236, 240, 150 A. 717; *Hillwood v. Hillwood,* 159 Md. 167, 169, 150 A. 286; *Singewald v. Singewald,* 165 Md. 136, 166 A. 441; *Bishop on Marriage, Divorce and Separation,* sec. 304; 9 *R. C. L.* sec. 11, p. 252.

In this case, as in all such cases, the rule relating to corroboration must not be confounded with that concerning the burden of proof. In such cases, slight corroboration will be sufficient, especially where the nature of the case is such, and upon consideration of the whole evidence there is no appearance of collusion. The burden of proof requires that the appellee sustain her allegations by a fair preponderance of testimony. Corroboration, as required by the statute, does not mean evidence sufficient to satisfy the rule as to the burden of proof. There may be corroboration, but the weight of the entire testimony may be in favor of the defendant. It is our opinion that such is the situation in this case.

More than twelve witnesses were called upon the part of the defendant to show the manner in which the parties to this suit lived, and the conduct of the defendant towards the plaintiff. These witnesses were people upon friendly terms with the parties, who frequently visited their homes, who took trips with them, and whose friendly relations were close. From their testimony it is shown that no condition existed that justifies the granting of a divorce *a mensa et thoro.* It is true that the burden of proof is not discharged by the number of witnesses called,

but by the kind and quality of evidence offered. In this case the evidence came from witnesses who had an opportunity to observe, and did observe, the conduct of the parties towards each other, the condition under which they lived, and the manner in which Mr. Porter supported his wife and provided for their home.

In conclusion it should be stated that the policy of the law of this State is not favorable to divorces *a mensa et thoro*, and they will not be granted except for grave and weighty causes, and even then the evidence must be clear and the corroboration satisfactory and in accordance with the law so frequently pronounced by this court. This policy, as well as the principles of the law in regard to this subject, have been well stated in two recent cases in this court. In *McClees v. McClees*, 160 Md. 115, 120, 152 A. 901, 903, the court said: "Parties to the marriage must realize that the relationship is seldom perfect, and that it is essential to the happiness and contentment of the parties, as well as for the benefit of society, that each tolerate inconveniences, annoyances, even hardships, and make sacrifices for the common welfare. It is for this reason that the law does not recognize trivialities, but requires that the causes for divorce be grave and weighty."

And again in *Gellar v. Gellar*, 159 Md. 236, 241, 150 A. 717, 719, it was said: "It may be that individuals who constitute the public have lost sight of what the courts are bound to recognize, that the state, representing society as a whole, has a real and vital interest in maintaining the marital status, so that it may not be dissolved, except for grave and weighty causes. This would seem to apply with even greater force to an application for divorce *a mensa et thoro*, which is practically nothing more than a request for judicial permission to live separate and apart, and which must result in the condition, described by an eminent judge, of throwing the parties back upon society in the indefinite and dangerous character of a wife without a husband and a husband without a wife."

And for the reasons stated the decree appealed from will be reversed as to that part which grants unto the appellee a divorce *a mensa et thoro,* and to the granting of permanent alimony; and as to the awarding of permanent guardianship and custody of Gail Porter to her mother, Elsie M. Porter, the decree will be affirmed, and this case is remanded in order that the chancellor may determine upon a fair amount to be paid to Elsie M. Porter for the support, maintenance, and education of the infant child of the parties.

> *Decree affirmed in part, reversed in part, and case remanded for the purposes set forth in the opinion, with costs in this court and the court below to be paid by the appellant.*