# MARION T. DUCKETT

## *vs.*

# BENNETT F. DUCKETT.

*Divorce for Cruelty—Evidence—Condonation and Recrimination—Pleading—Costs and Counsel Fees.*

In a suit for divorce, while the testimony of domestic servants employed about the house during the cohabitation of the parties cannot be repudiated altogether, it must be considered with caution, and taken always with due allowance, according to the bias displayed for the party in whose behalf the witness testifies.                                                     p. 554

Sexual cohabitation after acts of cruelty cannot be considered as condonation in the sense in which it would be after an act of adultery, but the voluntary marital cohabitation by the wife with her husband, after acts of cruelty on his part which would have entitled her to a divorce, will constitute condonation.                                                     p. 556

Whether acts of cruelty on the husband's part are to be regarded as condoned because she thereafter has sexual intercourse with him must depend in some measure upon the circumstances and particularly the temperament of the wife, since a woman may be unable to prevent such intercourse without risk of great bodily harm from a brutal husband, or, where there has been but a single act of violence, he may cause her to believe that it will never be repeated.                         p. 557

In a suit for divorce on the ground of cruelty by defendant husband, *held* that, the evidence being directly in conflict, plaintiff appearing qualified to take care of herself, she having continued to live with him in spite of his alleged cruelty, although she could have sought the protection of her parents, living a short distance away, she having admitted that she had an abortion performed to prevent the birth of a child, and there being many circumstances casting doubt on the truth of her testimony and that of her witnesses, she was not entitled to a decree.                                             pp. 557, 558

Plaintiff's testimony that she occupied the same bed and had sexual intercourse with defendant up to the night before she left him for the last time, was not only evidence of condonation, but reflected upon the credibility of her testimony and that of some of her witnesses, since it was not natural that she would be willing so to do after acts of violence and abuse such as they testified to.                                    pp. 557, 558

It is not only the right but the duty of the court to refuse a divorce, although the defense of recrimination is not formally set up, if it appears that plaintiff is guilty thereof.        p. 559

A decree in favor of defendant should not be reversed because either condonation or recrimination was not set up in the answer, the attention of the lower court not having been directed to the omission, though the record shows that defendant relied on both such defenses, and General Equity Rule No. 17 providing that "the court at every stage of the proceedings shall disregard any error or defect in the proceedings or pleadings which does not affect the substantial rights of the parties."
p. 559

The lower court having already made liberal provision for counsel fees, and having, in dismissing the bill, allowed two hundred dollars more to plaintiff's attorneys, and it appearing that plaintiff was engaged in an independent business, giving her a good income, *held* that the lower court's refusal to allow any further sum for the costs of prosecuting the appeal should not be disturbed.                                    pp. 559, 560

*Decided June 26th, 1923.*

Appeals from the the Circuit Court for Prince George's County, In Equity (BEALL, J.).

Bill by Marion T. Duckett against Bennett F. Duckett for divorce. From a decree dismissing the bill and from an order dismissing plaintiff's petition asking that defendant be compelled to pay the costs of an appeal and counsel fees for its prosecution, plaintiff appeals. Decree and order affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, and OFFUTT, JJ.

*S. Marvin Peach,* with whom was *Malcolm Hufty* on the brief, for the appellant.

*Lansdale C. Sasscer,* with whom was *J. Wilson Ryon* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

There are two appeals in this record. One is from a decree of the lower court dismissing the bill of complaint filed by the appellant against the appellee, in which she alleged cruelty of treatment, asked for alimony *pendente lite* counsel fees and suit money, and that the defendant be required to deliver to her her furniture and personal effects, and "that she be granted a divorce from the defendant upon final hearing, as provided by statute of this State," and that he be required to pay her permanent alimony for her maintenance and support. The other appeal is from an order dismissing the petition of the plaintiff in which she asked that the defendant be required to pay her the costs of this appeal when they accrued in the lower court and this Court, and her counsel fees for prosecuting and representing her on this appeal.

The prayer for divorce quoted above from the bill is a peculiar one, but as the defendant has made no point about it we will assume, as both parties seem to, that it is a bill for divorce *a mensa et thoro,* and, judging from the allegations in the bill, it is based on the ground of cruelty of treatment and excessively vicious conduct. There are no allegations which, if proven, could justify a divorce *a vinculo* at the instance of the wife. Both plaintiff and defendant were divorced prior to this marriage from their respective spouses, but it is, of course, not shown in this case who was at fault in either of the others, although the defendant was, at the time of the marriage to the plaintiff, and at the time the bill was filed, paying alimony to his former wife, and the plain-

tiff was apparently receiving from her former husband money for the maintenance and support of her child, according to statements in the record.

The facts alleged in the bill, if proven, were ample to entitle the plaintiff to a divorce *a mensa* for cruelty of treatment, unless prevented by her conduct, but the answer denies every material allegation, and the parties in their evidence have not fallen short of their respective allegations in their pleadings. One or the other is clearly guilty of perjury, as many, yea, most, of their conflicting statements cannot be reconciled, and are of such nature as cannot be excused on the theory of being mistakes. Both of them are shown by their own and other evidence to have been frequent violators of the law in reference to the sale of liquor at the house kept by the defendant, and the plaintiff admits that she had had one abortion performed on her since her marriage to the defendant, but denies that she had three, as the defendant testified, and said that the defendant had furnished the money to pay for the one she admits. The question of condonation and recrimination as to that and as to at least some of the charges of cruelty by the plaintiff will be referred to later.

There is no material charge in the bill which is not denied by the defendant, and many of the witnesses are of the kind spoken of by CHIEF JUDGE ALVEY in *Hawkins* v. *Hawkins,* 65 Md. 104, 107, where, after stating that the testimony came largely from the domestic servants employed about the house of the parties during the time of their cohabitation, he said: "Some of these witnesses manifest a decided bias for the party producing them, while others testify with more apparent fairness, and without showing any decided feeling for the one side or the other. And while the testimony of such witnesses cannot be repudiated altogether, it must be considered with caution, and taken always with due allowance according to the bias displayed for the party in whose behalf the witness testifies. In cases like the present, it is from necessity that the testimony of such witnesses has to be

resorted to, for ill usage, of the kind imputed in this case, is of a domestic nature, and does not generally occur in public, or in the open face of day."

While the plaintiff claimed that much of what she complains was of frequent occurrence, there were three occasions which seem to have been most relied on, and are more particularly mentioned in the bill and evidence. They were in October, 1920, July 4th, 1921, and on and after December 18th, 1921—the latter culminating in the plaintiff's leaving the defendant on the 17th of February, 1922, since which time she has not lived with him, although she has met him, as will be seen later. As she returned in the latter part of November, 1920, and remained with him until the seventeenth of February, 1922, it is not necessary to comment particularly on what occurred prior to her leaving, in October, 1920.

It would be impossible for us to believe the statement of either plaintiff or defendant as to any material question, if we accepted the opinion of the other, unless corroborated to a sufficient extent to remove the doubt that is forced upon us by them as to which is telling the truth in reference to any important item. The plaintiff is apparently corroborated by some of the employees at the hotel, but they tell improbable stories, and the most of them show bias and feeling against the defendant. Others, called by the defendant, at least partially sustain him. A number of persons of prominence gave a negative character of testimony—that they had not seen either cruel or improper treatment by the defendant of the plaintiff, but of course that does not prove that there was none at times when they were not present. Some employees who lived there for some time testify that they saw no evidence of the cruelty alleged by the plaintiff. It is difficult to believe that the plaintiff would have continued their marital relations as long as she did—up to the time she left the defendant in February, 1922—if he had persistently treated her with the acts of cruelty she alleged and undertook to prove.

The case presents some very peculiar features. As we have already said, nothing could be accomplished by referring to what transpired before the plaintiff left her husband in the fall of 1920, as after her return there was certainly condonation which would make it useless to consider his alleged treatment prior to that time excepting in so far as his later acts, as alleged by plaintiff, revived the original charges supposed to have been condoned. Although we have very many decisions in this State on the subject of divorce, condonation and recrimination, the law seems to be well and concisely stated in 9 *R. C. L.* 383, as to the effect of cohabitation after cruelty, and we will quote from it. It is there said (paragraph 176): "Cruelty, as a ground for divorce, is generally a course of conduct rather than a single act; and the rule is that sexual cohabitation after acts of cruelty cannot be considered as condonation in the sense in which it would be after an act of adultery. The effort to endure unkind treatment as long as possible is commendable; and it is obviously a just rule that the patient endurance by the wife of her husband's continuous ill-treatment should never be allowed to weaken her title to relief. On the other hand, it is well recognized that the voluntary marital cohabitation by the wife with her husband after acts of cruelty on his part which would have entitled her to a divorce will constitute condonation. Thus, it has been held that where it is shown that the last act of violence to the complainant wife was committed several months before she ceased to live and cohabit with the defendant, there is such condonation as will bar the complainant's right to relief, in the absence of proof of subsequent conduct on the part of defendant sufficient to do away with such condonation. This is especially true where a wife who has separated from her husband on account of his cruelty resumes marital cohabitation." "It is well settled that condonation of past matrimonial offenses is impliedly conditioned upon the future good behavior of the offending spouse, and it follows that if, after condonation, the offenses are repeated,

the right to make the condoned offense a ground for divorce revives." *Ibid.,* 384, paragraph 177.

It must depend in some measure upon the circumstances and particularly the temperament of the wife. A woman may be so situated that she cannot, without risk of great bodily harm by a brutal husband, prevent sexual intercourse with him, and continue to occupy his bed; or where there has been but a single act of violence under some peculiar condition and he makes apologies and seeks her forgiveness, he may cause her to believe that the act of violence will never be repeated and she may condone the offense. In this case, if the plaintiff and some of her witnesses have told the truth, the cruelty of treatment was frequent and the acts of violence on at least several occasions, but there is nothing in the record which would lead us to believe that the plaintiff was easily cowed or incapable of taking care of herself. She left him at least twice and was only a short distance from her parents, who lived in Washington, while she lived with her husband at Upper Marlboro. It is difficult to believe that a woman such as she appears to be would quietly submit to such continuous cruelty, as indicated by abuse of a most outrageous kind, interspersed with acts of violence, according to her claim, when she could easily get away from him and have the protection of her parents, if not actually live with them. When she left him in 1920 she took her furniture with her and then when she left him the last time she had a large bill charged to him in a store in Washington, and a little later started up the same kind of business that he was engaged in, at a place where she would probably draw customers from him. As stated above, she had one abortion performed to prevent the birth of a child, and the evidence of a doctor who called to see her was to the effect that her husband opposed the operation and that he did not, as she said, employ the party to perform it.

But notwithstanding what we have said, she testified that she occupied the same bed and had sexual intercourse with

him up to the night before she left the last time. That is
not only evidence of condonation, but reflects upon the credi-
bility of her testimony and that of some of her witnesses, as
it is not natural that if he treated her violently on July 4th,
1921, in December, 1921, and in February, 1922, besides
keeping up his abuse of her in a way that would disgust any
decent man or woman, if true, she would be willing still to
cohabit with him and, according to the evidence on both sides,
would manifest frequent manifestations of love and affection
towards him, as he would towards her, in the presence of the
domestics and guests.

We have held in *Fleegle* v. *Fleegle,* 136 Md. 630; *Martin*
v. *Martin,* 141 Md. 182; *Ruckle* v. *Ruckle,* 141 Md. 207,
that a continued refusal by a wife to permit marital inter-
course with her husband is matrimonial desertion consti-
tuting ground for divorce under our statute, and while having
an abortion performed has not been made a ground for di-
vorce, a court of equity ought not to be compelled to grant a
divorce in such a case as this when the plaintiff comes into
court with such an admission, not only of such a violation of
law, but committing one of the worst acts a wife can be
guilty of as against her husband.

No valid apology can be offered for his conduct, if a hus-
band is guilty of the violence and abuse the defendant is
charged with by the plaintiff in this case, but the very
enormity of the crime against a wife as shown by her state-
ment requires the court to see that the evidence is clear and
convincing, before the husband is convicted of it, under ordi-
nary conditions, and when the charge is made by one who
stands by her own admissions guilty of such an offense as
abortion, and when there are so many circumstances to cause
anyone to doubt the truth of the charges as testified to by
her and some of her witnesses, a court must hesitate to find
for the plaintiff on such conflicting evidence as this record
presents. Although the plaintiff denies that she then had
sexual intercourse with her husband, when we have her ad-

missions of it up to the time she left her husband and that
she went with him from the hotel in Washington in his auto-
mobile and spent some time at a club with him, even after this
bill was filed, in determining between the two as to that, we
must accept his statement as the most probable as to what
did or did not transpire during those hours they were to-
gether.

In reference to the question of pleading raised by the appel-
lant, that as the defendant did not set up recrimination or
rely on the defense of condonation, neither could be properly
introduced, we have in this State the cases of *Fisher* v.
*Fisher,* 95 Md. 314, and *Geisselman* v. *Geisselman,* 134 Md.
450, 463, on a rule adopted by us that it is not only the right
but the duty of the court to refuse to grant a divorce, although
the defense of recrimination is not formally set up, if it ap-
pears that the plaintiff is guilty of it.   Since Rule 17 was
adopted by this Court, as amended, it could hardly be con-
tended that a decree could be reversed because either con-
donation or recrimination was not set up in the answer.
That rule authorizes the court to permit amendments at any
time before final decree, and now contains this provision:
"The court at every stage of the proceedings shall disregard
any error or defect in the proceedings or pleadings which does
not affect the substantial rights of the parties."   There was
certainly enough in the record to show that the defendant
was relying on both condonation and recrimination, and if
the plaintiff proposed to rely on the fact that either of them
was not pleaded in the answer, the attention of the lower
court should have been directed to it.   If it had been brought
to the attention of that court it could have been very easily
amended if deemed necessary, but under our decisions the
court of its own motion could have refused the divorce by
reason of what appeared in the evidence.

Nor do we think that there was any error with reference
to the costs to enable the plaintiff to prosecute this appeal.
The lower court had already made liberal provision for

counsel fees, and in the decree appealed from allowed two hundred dollars more to the plaintiff's attorneys. The court heard the evidence in reference to the financial condition of the parties and declined to allow any further sum—after dismissing the bill. The evidence showed that the plaintiff was then engaged in an independent business of her own, in which she was apparently earning a good income—at least we can assume that the court so found—and there was no occasion for further help from a court of equity. Divorce and alimony proceedings are becoming so frequent and are made so expensive, generally by the wife relying on the practice to require the husband to pay all expenses, that it behooves courts of equity to be more cautious than formerly in making such allowances, as it undoubtedly has a tendency to encourage such litigation, to the great injury of the public. We are not, therefore, prepared to disturb the action of the lower court in reference to the costs in this case.

> *Decree and order affirmed, the costs to be paid by the appellant.*