H. ELMER SINGEWALD *v.* ELEANOR SMITH
SINGEWALD.

ELEANOR SMITH SINGEWALD *v.* H. ELMER
SINGEWALD.
[Nos. 44, 45, 46, April Term, 1933.]

*Decided May 26th, 1933.*

The causes were argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Paul M. Higinbothom* and *William Purnell Hall,* with whom was *Sophie K. Nordenholz* on the brief, for Eleanor Smith Singewald.

*J. Purdon Wright* and *Isaac Lobe Straus,* for H. Elmer Singewald.

OFFUTT, J., delivered the opinion of the Court.

Eleanor Smith and Elmer H. Singewald were married on November 14th, 1917, by a Presbyterian minister in Bel Air, Maryland, and, except for occasional intervals of short duration, lived together as husband and wife until October 19th, or 20th, 1932, when they separated. There were two children of the marriage, Eleanor and Ruth, who were, at the time this suit was brought, aged thirteen and twelve years, respectively. For some time prior to that date, the relations between Mr. and Mrs. Singewald were far from harmonious, and on October 26th, 1932, she filed against him in the Circuit Court of Baltimore City the bill of complaint in this case, in which she charged that his conduct towards her had been so cruel, brutal, and vicious that she had been forced to leave him, and in which she prayed that she be divorced *a mensa et thoro* from him; that she be awarded the care and custody of their two infant children; that she be allowed alimony *pendente lite* and permanent alimony. The defendant answered, denied the charges and alleged that his wife had abandoned and deserted him without just cause. The case was tried upon those issues, and on January 31st, 1933, a decree was entered in which the court dismissed so much of the bill as prayed a divorce, allowed the plaintiff a counsel fee of $600, and further decreed that "the custody of Eleanor Singewald and Ruth Singewald, infant children of the parties hereto be and it is hereby awarded to Eleanor Smith Singewald, with the right to Elmer H. Singewald to have said children every other week end from one-thirty P. M. Saturday until seven P. M. Sunday, he, the said defendant, to pay all traveling costs incident to the week-end visits of the children to him; the said Elmer H. Singewald, defendant, to pay to and unto the said Eleanor Smith Singewald the sum of twelve dollars and fifty cents ($12.50) a week for each child, emergency and extraordinary expenses, such as doctors' and dentists' bills, to be in addition to the weekly allowance provided; this court retaining jurisdiction over said children."

From so much of the decree as in part dismissed the bill, the wife appealed, and from so much thereof as awarded the custody of the children to the mother and allowed her a counsel fee, the husband appealed, and those three appeals are submitted by this record. No point was made in this court, either in the oral arguments or the briefs of appellant, as to the allowance of a counsel fee to Mrs. Singewald, and the appeal from so much of the decree as dealt with that question will be treated as abandoned, so that there remain in the case two questions, (1) whether the court erred in denying Mrs. Singewald a divorce *a mensa et thoro* and (2) whether there was error in so much of the decree as dealt with the custody of the children.

The learned chancellor who heard the case, in a very careful and discriminating opinion, reached the conclusion that the evidence was not sufficient to justify a decree of divorce, and accordingly dismissed so much of the bill as prayed that relief, and, since the parties were in fact actually separated and it was necessary to make some disposition of the children, he reached the further conclusion that under all the circumstances, in view of their age and sex, it was appropriate and for the best interests of the children themselves that their custody be awarded the mother, reserving to the court jurisdiction over them, and reserving to the father the right to have them "every other week end from one-thirty P. M. Saturday until seven P. M. Sunday.

With so much of the decree as denies the divorce and awards the general custody of the children to the mother, we are in entire accord, and in view of that opinion it would serve no useful purpose, but would be needlessly embarrassing to the parties, to review in detail in this opinion the voluminous and recriminatory evidence found in the record, and we will therefore merely state our conclusions in respect to it.

The case was ably presented to this court, but in strict accord with the conventional traditions of our system of litigation, under which each side assumes the infallibility of favorable witnesses and the fallibility of adverse witnesses, leaving to the court to discover as best it may the truth which

lies somewhere between those extremes. In dealing with so much of the case as relates to the prayer for a divorce the court is aided by the rule that one holding the affirmative is under the burden of proving it, while in dealing with so much of the decree as relates to the custody of the children it is aided by no rule or presumption other than that some positive weight must be given the conclusion of the chancellor who had before him the witnesses, and who had therefore in determining the credibility of their testimony opportunities of observing their demeanor and attitude denied to this court.

The wife's complaints as to cruelty may be classified in respect to two periods: one, prior to October, 1919; the other, subsequent to that date. Whether the acts and conduct of which she complained and which occurred prior to October, 1919, were sufficient in themselves to constitute legal cruelty, as defined by this court in such cases as *McKane v. McKane,* 152 Md. 516, 137 A. 288, and *Short v. Short,* 151 Md. 444, 135 A. 176, need not be considered or decided in this case, for, whatever the effect of such acts and conduct may have been, they were condoned by the wife.

As a result of her husband's alleged cruelty, Mrs. Singewald in October, 1919, left his home, carrying with her their infant child, and went to live with her mother in Bel Air, and shortly after that brought a suit for a limited divorce against him on the ground of cruelty. After that, at his request, she returned to his home, lived with him as his wife until October, 1932, throughout that entire period had marital intercourse with him, from time to time left his home because of cruelty of which she now complains, and, after each separation, returned, and after each return resumed marital intercourse with him. Such conduct amounts in law to a condonation of offenses occurring prior to October, 1919. For while condonation is based upon an implied promise that the erring spouse will not repeat the injurious offenses, nor be guilty of other misconduct which would render the continuance of the marital relation intolerable to the injured party, and upon the implied condition that a breach of the promise revokes the condonation (*Keezer on Marriage and Divorce,* sec. 425;

9 *R. C. L.,* *"Divorce and Separation,"* sec. 177; 19 *C. J.* 87; *Duckett v. Duckett,* 143 Md. 556, 123 A. 55), there must of necessity be some limitation to that rule. And where the offenses sought to be revived are so remote in point of time, and the conduct of the parties has been of such a character that no rational conclusion can be reached other than that the complainant has finally and unconditionally surrendered any and all rights to complain of such offenses, they may not be revived as a separate and sufficient ground for divorce (*Duckett v. Duckett, supra; Daiger v. Daiger,* 154 Md. 505, 140 A. 717), although they may be considered in determining the quality and significance of defendant's subsequent conduct. For, as stated in a quotation from *McFarlane v. McFarlane,* 11 Scotch Sess. Cas., 2nd Ser., 633, found in *Bishop on Marriage, Divorce and Separation,* sec. 304: "Although acts of violence committed at an earlier period, and which have not prevented her from living with him, or going back to him after they have been separated, cannot be made the sole foundation of an action of separation, they may form the subject of investigation, and proof with a view to determine what is the true issue of the case; namely, whether the wife can with safety to person and health live with him now. Because not only do they afford an indication of what the man's temper and habits are, but they also show what may be the result of still continuing to live with him if there have been acts of recent occurrence, although these may not be of the same aggravated type. In the words of Lord Jeffrey in another case, 'the last drop makes the cup of bitterness overflow'."

As is not unusual in cases of this character, the key to the case as well as to the evidence lies in the varying viewpoints of the parties, and in the failure of each to allow for the peculiarities of the other. Each expected of the other a degree of tolerance, forbearance, and submission which neither yielded to the other, and each measured the other's conduct by a standard which neither regarded as binding himself or herself. Consequently every slip, every fault, every harsh word or inconsiderate act was noted and preserved with that

intense and unyielding bitterness which so often reaches its flower in domestic litigation.

The parties themselves are respectable people, of far more than ordinary intelligence, devoted to their children, and both honestly no doubt made some effort to preserve the home and to promote the happiness of themselves and their children.

Singewald is an intense, self-centered and ambitious man, who has by thrift, industry, and energy won a substantial and respectable place in the business world. He has a number of irritating antipathies, which include coffee, patent leather shoes, and his mother-in-law. He has some capacity for vivid invective, insistent, not always with success, upon supreme authority in his home, and, either as the result of business training or domestic experience, he early discovered the futility of engaging in oral debate upon domestic questions with his wife, and would commit his emotions to paper in the form of letters or essays, which he either sent or handed to her. He had few interests outside his home, he provided in a material way for his family, he was devotedly attached to his children, and he had a commendable consciousness of his civic duty. He was active in church work and interested in the religious education of his children. His treatment of his wife, however, was not so happy. His habit of writing what he might have spoken was no doubt irritating to her, in view of the fact that he was not always present when she read the letters, and had no opportunity of commenting upon his comparison of her antecedents, qualities, and conduct with his own, a comparison which rarely flattered her. He has, apparently, deliberately and intentionally so arranged his property so as to exclude her as far as possible from participation therein, he has at times been rudely inconsiderate of his wife's natural affection for her mother, and his language to her was at times abusive and insulting.

Mrs. Singewald has been a devoted mother, and in many ways a faithful and loyal wife. For many years she performed all of her household duties without assistance, was thrifty, economical, and industrious, and while she did not

suffer the peculiarities of her husband gladly or with notice-able patience, she nevertheless did put up with them until their final separation. She, too, had no inconsiderable talent for biting repartee, and, while her husband complained of her in letters addressed to her, she complained of him to lawyers. She was not always frank with him, she at times disregarded his wishes in training the children, and at times deceived and misled him as to debts contracted on his credit. The wife in her bill alleges no specific instances of cruel or vicious conduct, but in her testimony it appears that she relies largely upon several alleged acts of physical violence, most of which are said to have occurred prior to October, 1919, and upon the husband's general course of conduct.

Mrs. Singewald herself testified that on a number of occa-sions her husband had subjected her to physical violence and indignities, but, except as to two or three instances, her charges were denied by the defendant and wholly uncorrobo-rated. And if her testimony as to those instances is accepted as true, the acts of which she complains were not of such a character as to constitute cruelty, as defined in *Short v. Short, supra,* or to constitute the basis for a divorce *a mensa et thoro. McKane v. McKane, supra.* They occurred many years ago, carried no threat of actual physical injury, were obviously not premeditated, and apparently, until this suit was instituted, were not regarded seriously by Mrs. Singe-wald. She also testified that her husband was opposed to her having children, suggested that she prevent it, and on one occasion when she was pregnant advised her to have an abor-tion performed. But those charges are not supported by the record. Her statement as to what he said to her is not cor-roborated, it is undisputed that Singewald is devotedly at-tached to his children, and the highly respected physician who was consulted by Singewald in connection with his wife's condition testified that at that time Mrs. Singewald was suf-fering from the consequences of an attack of pleurisy, and that the question which was submitted to him was whether suffering her pregnancy to mature would be physically in-jurious to her in her condition.

Finally, she said that she left her home because she was afraid that her husband would harm her or their children, and she alleged as a reason for her statement that her husband told her that what she was doing meant "murder and suicide for her and the children." Singewald denied that he made any such statement, and her testimony that he did was not corroborated. It did appear however that on September 21st, 1932, Singewald had written her a long letter filled with reproaches and complaints of incidents and conduct covering the whole period of their marriage and in which he upbraided her for occurrences even prior to the marriage. The immediate occasion for the letter was the wife's objection to her husband's visiting her in her bedroom where their oldest child was asleep. After receiving the letter, she consulted Judge Owens of the Supreme Bench of Baltimore, who had at one time been her counsel, and Singewald, in an endeavor to reconcile the parties, arranged a conference between them and their respective counsel in Judge Owen's office. After that conference, she said: "When I came in the house at 9.30 I went into the kitchen and took some bromide and went into the dining room and sat down at the table, and Mr. Singewald was in the front room and he began talking to me in the front room. Well, I didn't pay any attention; I didn't even know a word that he said, until he came out in the dining room and sat right opposite me and shook his finger in my face. He said, 'Eleanor, what you are doing means murder and suicide for you and the children, and this is probably my last night in this house.' "

Explaining her employment of a lawyer she said: "I did not want a divorce, I tried to see if some one could not talk to Mr. Singewald and fix things up so that we could fix things up because of the children. But, then, I was afraid of him. (The Court): Afraid of him? About what? (The Witness): I don't know. I was always afraid he was going to do something. After I had been to a lawyer, and he thought I was going to leave him, I was always afraid he would do something to harm me or the children." And later on, "Well, on that occasion, was his manner at all any differ-

cut from what it had been on prior occasions when you had had any difficulties? (The Witness): Well, I had seen him when I have been threatened a number of times, and I was afraid of him, and we also have had fusses when I was not afraid of him, and we have also had a number when he would threaten to do things and I was afraid of him, and this was one of the occasions that I was afraid of him." And she added that he had never threatened the children before and had never threatened her in "just exactly that way," and that she had reason to be afraid because of the alleged mental condition of his sister.

Apart from that statement, which was denied by Singewald and uncorroborated, there was nothing in Singewald's past conduct to justify her apprehension that he thought of inflicting bodily injury upon her or their children. The only acts of physical violence of which she complained, occurred, if at all, years before, and were not in themselves of a vicious character nor apparently done with any malignant intent, and the very fact that he wrote so many letters rather than continue verbal controversies with his wife was some indication of mental restraint. And while it does appear that Singewald was irritable, easily annoyed by trivial incidents, and faultfinding, there is nothing in the record to indicate that he is a man of evil disposition or vindictive temper. Nor, in view of his positive denial of the alleged threat and lack of any sufficient corroboration to be found either in the circumstances or direct evidence, can it be assumed that he made the statement.

But while the evidence as to physical violence and indignity is insufficient and unsatisfactory, it does appear, not only from the testimony of the wife's witnesses, but from Singewald's own letters and admissions, that his treatment of his wife prior to their latest separation showed slight evidence of affection, confidence, or even respect. He was censorious, faultfinding, disagreeable, and, according to her testimony and that of their children, his language to her and to the children about her was abusive, insulting, and humiliating. But the effect which such treatment would ordinarily

have on the wife's right to complain is neutralized by her own admission that she scolded, abused, and insulted him in much the same manner as he did her. And it is impossible from the record to say with any assurance of truth which of the two was more in fault. His nagging interference with the management of the household and the children, his painfully careful scrutiny of his wife's expenditures, his interminable letter writing, his faultfinding, his care in excluding her so far as possible from any share in his estate, were all naturally irritating and exasperating to her. On the other hand the wife is a highstrung, nervous, person, and her sharp caustic comments, her disregard of her husband's wishes in respect to the training of the children, her deception of him in pledging his credit, her indifference to his complaints, her habit of taking her troubles to persons outside the family, were no doubt just as humiliating and annoying to him.

It is not the function of the courts in such cases as this to arbitrate family quarrels, but to determine upon the evidence whether either of the parties has been guilty of such conduct as would make a continuance of the marital relation inconsistent with the health, self-respect, and reasonable comfort of the other. *Nelson on Divorce and Separation,* sec. 331; *Short v. Short; supra; McKane v. McKane, supra.* And in determining whether in a given case the evidence supports a charge of cruelty justifying a divorce, it is well settled in this state that such relief, with its resulting destruction of the home, severance of family ties, and division of the allegiance of the children between embittered and hostile parents, should not be granted except upon substantial grounds established by convincing evidence. To define what will constitute substantial grounds would manifestly be undesirable, even if it were possible, because to embrace all such grounds in a rigid formula it would be necessary to allow for and include the infinite variety of circumstances under which human perversity may manifest itself, and would result either in a pernicious restriction of the court's jurisdiction or a dangerous expansion of it. To state in definite

terms what will not constitute substantial grounds involves no such difficulty, and that has been done by Judge Parke, speaking for this court in *Short v. Short, supra,* in the following language, quoted with approval in *McKane v. McKane, supra; Wendel v. Wendel,* 154 Md. 21, 139 A. 573; and *Gellar v. Gellar,* 159 Md. 240, 150 A. 717: "Legal cruelty must be such conduct on the part of the husband as will endanger the life, person, or health of the wife, or will cause reasonable apprehension of bodily suffering. It should be of such a nature as to render cohabitation physically unsafe to a degree justifying a refusal to continue it. Marital neglect, indifference, a failure to provide as freely as the wife may desire in dress or in conveniences, sallies of passion, harshness, rudeness, and the use of profane and abusive language towards her, are not sufficient, if not in manner and degree endangering her personal security or health. *Childs v. Childs,* 49 Md. 514; *Hawkins v. Hawkins,* 65 Md. 108, 3 A. 749; *Bounds v. Bounds* 135 Md. 220, 108 A. 870."

The proof in this case falls short of the measure prescribed by that rule, and so much of the decree as denies the wife's prayer for a divorce *a mensa et thoro* will be affirmed. In reaching that conclusion, we have intentionally refrained from deciding that the act of the wife in leaving the husband's home was an act of desertion, since that question is not directly presented by the appeal, and there may be cases in which, while the conduct of the erring party would not constitute legal cruelty, it might nevertheless excuse the act of the injured party in leaving the common home. *Nelson on Marriage and Divorce,* sec. 89; 19 *C. J.* 80; *Polley v. Polley,* 128 Md. 66, 97 A. 526; 9 *R. C. L.* 150.

The second question presented by these appeals is whether there was error in so much of the decree as awarded the custody of the children to the mother and at the same time imposed upon the father the obligation to support them. Whatever may be said of the relative rights and claims of parents to the custody of their children, in such a case as this, the paramount and controlling consideration is the welfare of the children themselves. Accordingly, where the

court is under the duty of awarding such custody, it will adopt a course which from all available sources of knowledge appears most likely to promote their best interests. *Barnard v. Godfrey,* 157 Md. 264, 145 A. 614; *Pangle v. Pangle,* 134 Md. 170, 106 A. 337; *England v. Megear,* 145 Md. 574, 125 A. 731; *Allen v. Allen,* 142 Md. 701, 121 A. 926. Counsel for Mr. Singewald have in their brief cited a wealth of precedent in the discussion of this question, but the principle stated is firmly imbedded in our law, and must be taken as established and controlling.

Applying it to the facts of this case, we are in accord with the decree in so far as it awards the general custody of the female children to their mother. They are at an age when they need and can obtain from her guidance, advice, and care which a father is not qualified to give, and, in the absence of anything which could indicate that she is not fitted for that custody, there is no reason to disturb that part of the decree. The court expressly reserved jurisdiction over the children, and their final custody must depend to some extent at least upon the future attitude of the parents in respect to their marriage status, for it cannot be assumed from anything in this record that they will continue to live apart. It is true that the wife said in her testimony that she was unwilling to "go out there now and live there," meaning at Singewald's home, but that was obviously not meant to be final, when considered in connection with this statement which she made just prior to that: "In other words, you wanted Mr. Singewald to get out of there? A. I did not want him to get out. I was willing to stay in that house with him, but he was to act like a husband and I was to act like a wife. But I said I would do anything, I would agree to live somewhere else and he could see the children at any time or be with the children at any time, I would even leave the new house out there if that was cheaper, I would do anything so that we could be a little happier, because I thought he was unhappy as well as I was. Q. Well, I haven't found out yet what your proposition was, or what do you mean when you say you would do anything? I thought it

was that you and Mr. Singewald live apart somewhere? A. No, I did not want to live apart. I would have left him years ago if I had not wanted to have my children with their father in their own home, and the home out there I was so proud of." If either party willfully and without justification refuses to resume marital relations, the court can at the proper time deal with the permanent custody of the children in the light of that situation, which does not now exist.

The decree allows the father to have the children at weekends every other week, but fails to provide that he may see them in the intervals between such visits. The provision that he be deprived of their custody was not imposed as a punishment, nor because he was morally or temperamentally unfitted to care for them, for so much of the decree as permitted him to have them in his custody every other week-end indicated that the chancellor held no such opinion, but it was imposed because, in view of the age and sex of the children, under the circumstances of the case, their welfare and interests will be better served by committing them to the charge of the mother rather than that of the father. He has done nothing to forfeit his right to their custody, nor was the decree based upon such a ground. Under those conditions, the decree should properly have granted him the privilege of reasonable access to his children during the intervals intervening between their visits to him. But inasmuch as the decree can, if he is denied such access, upon the father's petition, be modified to that extent, it is unnecessary to reverse it for that omission.

In view of that conclusion it becomes unnecessary to discuss or consider so much of the evidence as reflects upon the father's want of common sense and circumspection in dealing with his children, except to say that it emphasized the propriety of the court's action in respect to their custody. Nor is it necessary to discuss at any length rulings of the trial court excluding two letters from Singewald to his wife, and refusing to permit the witness Isaac S. Field to tell the court what he had found Singewald's disposition to be. The letters were mere hearsay, and contained nothing relevant to

150

the issues in the case that Singewald could not have stated as a witness, and Mr. Field's opinion of Singewald's disposition, however favorable to him, could not possibly have affected the conclusions we have announced.

For the reasons stated, therefore, the decree appealed from will be affirmed.

*Decree affirmed, with costs.*