RALPH B. BONWIT *v.* LEONA F. BONWIT
[No. 7, October Term, 1935.]

*Decided October 30th, 1935.*

The cause was argued before URNER, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Allan H. Fisher* and *Morton P. Fisher*, with whom was *Samuel J. Fisher* on the brief, for the appellant.

*Robert R. Carman*, with whom were *Keech, Carman, Tucker & Anderson* on the brief, for the appellee.

JOHNSON, J., delivered the opinion of the Court.

Leona F. Bonwit and Ralph B. Bonwit were married on May 4th, 1921, and although their married life was not at all times pleasant, they managed to live together until May 15th, 1934, at which time Mrs. Bonwit left their home on Eutaw Place in Baltimore City under circumstances which will be hereafter referred to, for the purpose of attending a circus party with some friends. At the conclusion of the party she did not return to the family home until two days later, and then only upon condition that her husband first remove therefrom. Since then she has lived there with the three children of the parties, two boys, aged twelve and three and one-half years, and one girl, aged nine; the husband during this time having lived at a hotel. The parties have not lived together since the above occasion, and on September 14th, 1934, the wife filed a bill of complaint against the husband, praying among other things a divorce *a mensa et thoro* upon the ground of abandonment and desertion, which it is alleged came about by reason of cruel treatment on the part of the husband, making it necessary through fear on her part of bodily harm and physical violence from him that they live apart.

From a decree passed by the chancellor in the lower court granting (a) a divorce *a mensa et thoro*, (b) awarding the wife the custody of the three infant children, subject to the right of the father to have one or more of them at all convenient times, and (c) awarding as alimony and for support and education of the three children the sum of $8,500 per annum, payable in semi-

192

monthly installments, plus the further sum of $1,000 as a counsel fee to her solicitor, an appeal is taken by the husband.

Bonwit is not a strong man physically, and before his marriage he had a tubercular condition which affected him to such an extent as to become noticeable, with the result that the wife refused to enter into the marriage relation until he could pass a satisfactory physical test. In short, he is and always was a neuropath, a person who for apparently trivial reasons would become wrought up to a great degree of excitability, with the result that he would then say and do things which thereafter caused him much genuine grief and unhappiness. His condition has at least been progressive within recent years, within which time both of his parents died and the burden of managing a large and complicated business was transferred from them to him. His situation is aptly described by himself: "I let the worry and the responsibility of the business get the best of me. I would come home in the evenings just loaded up with worry and somehow almost literally bleeding from the mouth with worry in the past few years about business losses, market losses, taking on too much work that I was warned against taking on, and I did go home and I was irascible there is no use talking about it, I was irascible at times."

His condition was well known to appellee before their marriage. *See Clark v. Clark,* 162 Md. 699, 159 A. 114.

However, notwithstanding these faults, Bonwit is a highly successful business man with an annual income of $20,000. At all times his family has been maintained by him in a state of great luxury, and it may truly be said that he is desperately in love with Mrs. Bonwit, and entirely devoted to their three children, and this feeling, at least on the part of his children, is reciprocal. He makes no complaint against his wife whatsoever, and his earnest and sincere efforts to effect a reconciliation with his wife suggest an undue hesitancy upon his part to deny many of the complaints she makes against him.

Both parties are respectable and substantial people. The chief worry of the wife seems to have been caused by the temperament of the husband, which on various occasions, much to her annoyance, has resulted in violent outbursts of temper, accompanied in some instances by his slapping her. Like many wives who are maintained in a state of luxury by the thrift and economy of industrious husbands, Mrs. Bonwit's duties were largely social in nature, and the impression is inescapable that many of her complaints had their inception in the fact that she insisted upon carrying her husband, a physically weak and mentally tired business man, into a far more abundant social life than was conducive to the welfare of his physical or mental state.

To sustain a charge of abandonment and desertion as here alleged, the plaintiff must prove a voluntary separation of one of the parties from the other, or the refusal to renew suspended cohabitation without justification, either in the consent or the wrongful conduct of the other party. *Gill v. Gill,* 93 Md. 652, 654, 49 A. 557; *Taylor v. Taylor,* 112 Md. 666, 77 A. 133; *Buckner v. Buckner,* 118 Md. 101, 84 A. 156; *Muller v. Muller,* 125 Md. 72, 93 A. 404; *Klein v. Klein,* 146 Md. 27, 125 A. 728; *Daiger v. Daiger,* 154 Md. 501, 503, 140 A. 717; *Schouler on Marriage, Divorce and Separation,* vol. 2, secs. 1644, 1645; Code, art. 16, sec. 39.

Thus it must follow that unless the wife has met the burden undertaken by her of establishing, by convincing evidence, sufficiently corroborated, that the husband is guilty of legal cruelty, by which is meant such conduct on his part as will endanger her life, her person, or health, or will cause reasonable apprehension of bodily suffering, then she is not justified in law in refusing to continue the marital relation, and there would then be no desertion on the part of the husband. *Short v. Short,* 151 Md. 444, 135 A. 176; *McKane v. McKane,* 152 Md. 515, 137 A. 288; *Wendel v. Wendel,* 154 Md. 11, 139 A. 573; *Gellar v. Gellar,* 159 Md. 236, 237, 150 A. 717; *Singewald v. Singewald,* 165 Md. 136, 166 A. 441; Code,

art. 35, sec. 4. But unless coming within these tests, conduct amounting to rudeness, harshness, neglect, indifference, sallies of passion, and even the use of profane and abusive language toward the wife, are insufficient upon which to justify a decree of this nature.

Moreover, the policy of the law of this state looks with disfavor upon divorces *a mensa et thoro* (*Porter v. Porter,* 168 Md. 296, 177 A. 464, and cases there cited), for, as was said by Judge Digges in *Gellar v. Gellar,* 159 Md. 236, 241, 150 A. 717, 719: "This would seem to apply with even greater force to application for divorce *a mensa et thoro,* which is practically nothing more than a request for judicial permission to live separate and apart, and which must result in the condition described by an eminent judge, of throwing the parties back upon society in the indefinite and dangerous character of 'a wife without a husband and a husband without a wife.' "

Also Judge Offutt, in speaking for this court in the case of *Singewald v. Singewald,* 165 Md. 136, 146, 166 A. 441, 446, said: "It is not the function of the courts in such cases as this to arbitrate family quarrels, but to determine upon the evidence whether either of the parties has been guilty of such conduct as would make a continuance of the marital relation inconsistent with the health, self-respect, and reasonable comfort of the other. *Nelson on Divorce and Separation,* sec. 331; *Short v. Short, supra; McKane v. McKane, supra.* And in determining whether in a given case the evidence supports a charge of cruelty justifying a divorce, it is well settled in this state that such relief, with its resulting destruction of the home, severance of family ties, and division of the allegiance of the children between embittered and hostile parents, should not be granted except upon substantial grounds established by convincing evidence."

The wife, to justify her claim of desertion by the husband, attempts to characterize fourteen specific instances of cruelty upon his part. The first of these consisted of a slap which she states he gave her over some trifling mat-

ter about one month after their marriage. The second consisted in his pushing a pillow over her face during the latter part of the year 1922 while she was pregnant. She states this frightened her. The next occasion was on November 19th, 1924. They were riding in Windsor Hills and on the way home got lost. She made some remark, and he again slapped her and told her to "shut up." It was more than two years later before further difficulty took place, and over some trifling matter he again slapped her and made her sit down. The husband then went to New York on business, and letters passed between them, in which he acknowledged he had done wrong and promised to be a model husband thereafter, with the result that they became reconciled. The next complaint was in April, 1927, when he again slapped her. This time the argument was started because she had made four engagements for him and herself in succession, and he objected because so many social engagements were too severe a strain for one of his constitution and business responsibility. Up to this time the wife states there were no marks as a result of these encounters.

Again she states that on December 25th, 1927, they had been out playing cards, and when they returned he was furious and slapped and choked her, leaving slight marks on her neck. The seventh complaint referred to September 7th, 1932, when on their way home from the Country Club he was in bad humor and slapped her and said, if she did not like it she "could get out and walk." About a month later she complains that while at the Country Club he became abusive toward her, calling her ugly names and threatening her. Upon their return to the home the same evening she went to the room of their son, but was told by the husband to come on down, as he was not going to hurt her. The next complaint of his conduct occurred six days later. With some friends they went to Sherry's, a place for entertainment in Baltimore, when he again threatened her and pushed over a table upon her. Later in the evening they went to Child's Restaurant, and she states he almost got into a fight with

one of the waiters. The husband's version of events on this occasion differs materially from that of the wife. He testifies that at Sherry's some man came over to the table and asked one of the ladies to dance, and that she asked him for protection, because the man in question was intoxicated; that Mrs. Bonwit was then dancing with another party, and he asked the stranger to leave, as he did not desire any argument with him; that the place was crowded, and he asked if they should not leave, because he did not like the crowd. Again she states that two couples who were friends of hers were at the home on December 3rd, 1932, and decided to go to Sherry's, and, in spite of her recent experience there, she had decided to return. She had not asked her husband at that time, and when informed of their plans he decided not to go, and followed her into the kitchen and gave her a push which caused her to fall on her side. The eleventh complaint refers to an occasion on a Sunday evening in October, 1933, when she states her husband entered her bedroom and without any explanation choked her and left marks upon her throat. The effect of the husband's testimony is that he knows nothing about this whatsoever. It should also be observed at this point that of the eleven charges of the wife above recited, there is not the slightest evidence of corroboration of them, notwithstanding in several instances such corroborative proof would seem to have been available, assuming her testimony as to these occurrences to have been correct. The twelfth is apparently on its face the most serious of her complaints and took place on May 6th, 1934. There had been some previous discussion between the husband and wife in regard to her lending one of her friends $500. Upon this evening, she states, they had friends for dinner and these had later left him downstairs and gone upstairs to help her; that this seemed to annoy him quite a lot, so later he slapped her and told her that her friends could not "high hat me"; that afterwards, when she went to bed, he pulled her out by the hair of her head and choked her, and she received a black eye. She said:

"He did not hit me in the eye, but his fingers were on my face like that (indicating) and the bruises lasted three or four weeks, a terrible looking eye." This affair is the first of the twelve instances above detailed which is corroborated. Her mother, Mrs. Apple, and a Mrs. Lieberman, also a friend of hers, testified that about this time her eye was black. Of course, they knew nothing as to the circumstances under which the injury occurred. His version of this is as follows:

That a discussion had come up about lending money, and he objected strenuously and suggested how it made enemies and not friends; that he did not recall telling his wife her friends "high hatted" him, but did several times tell her about expenditures and conditions; that an argument ensued, and he slapped her; that he did not recall choking her or pulling her hair; that she said, "My eye hurts," and he replied, "Yes your eye does look red, and I am sorry," and he went downstairs and got some ice and put it on her eye. Later he was shocked to notice it was black. Thus, without justifying the morals of his conduct in slapping his wife upon those different occasions, her testimony, taken in connection with his, does show that the serious feature of the encounter, and upon which much reliance was based at the argument of the case, was recognized by both parties as an accident.

That the husband's concededly sincere desire for and offers of reconciliation have influenced his testimony are again evident from illustration:

"Q. You say you want to make amends for what you have done in the past. That carries with it certainly the thought that in the past you have not done exactly what you should have done, you admit it? A. That is true. You see, I am not fighting this case, I am pleading it, Mr. Fisher."

From May 6th, the date of the occasion above considered, until May 15th, 1934, we are not prepared to state from a consideration of the record before us that the married life of the parties was not a normal one for them.

They lived together in the home and there was no disturbance, and no further quarrels took place. In testifying about the occasion of May 6th, his wife stated: "I thought I would give him a chance. I just sort of hated to break away on account of the children, although it was not anything very pleasant for them either." During this period it should be noted that Mrs. Bonwit at least on one occasion visited her mother, and we must assume from reading the record that the services of her counsel, which it seems she had used quite freely in connection with her marital difficulties, were also available to her, and her conduct subsequent to this encounter demonstrates to us that she stood in no fear of her husband.

Mrs. Bonwit admits that, after moving from the apartment in 1932, they went to live in a pretentious home on Eutaw Place, the title to which was by the husband placed in their names as tenants by the entireties. She was then asked by counsel: "And at that time when the house was bought you had no idea of any separation at that time, did you?" To this she replied: "No, of course not."

Subsequently, on May 15th, notwithstanding she herself had decided to give him another chance, and that the parties did live together in the home under conditions and circumstances heretofore observed by us, she testifies that her husband and herself were invited to a circus party to be given that evening; that in the morning he came downstairs in bad humor and called their hostess, informing her that he would not be there and did not know that his wife would be there, and further that he told her he would make her look like a prize fighter, and would black both eyes, and was very abusive; that at night, when he came home from his work, he had not spoken to her, and she did not know whether he was going, so after dinner she inquired if he intended to go, and he replied: "What do you care?" To which she retorted: "I don't. I just wanted to know whether I was going with you or some one else." That the husband then told her to do as she pleased; that she could do him a favor and drop dead as far as he was concerned, and shortly thereafter she called

up some friends who were going and had them come by for her; that later in the evening her husband did attend the circus party, but gave her black looks, and did not speak to her and sat away off by himself. As a result of these looks, she states she was afraid to go home, so she went to the home of her friends and spent the night there. The husband denies he threatened his wife or intended to do her any harm. His version of this instance is as follows: "I called this lady up in the morning. I said, 'I am too tired, I have to get some sleep.' Then later on I thought it over and I thought the only decent thing was to go. When I got home in the evening I was just all in. I finally got in the bathroom and washed up a bit. I really did not want to go out, I had a headache and felt all in. She came upstairs and said, 'Are you going with us?' I said, 'I wish you would let me be myself a few minutes, I am dead.' Finally they went ahead and I got in my own car and went over there. I did not enjoy it because I felt sick. I had not been well, but I had not been complaining about my health either. I just felt all in."

A further and final scene occurred on May 20th, 1934, which to our mind reflects no discredit upon Mr. Bonwit, but rather shows he was trying to do what he considered the decent thing. It was on Sunday morning, and the father had an engagement to take his young son into the country to shoot ground hogs. When he arrived at the home, he could not resist the temptation to see his wife and plead for a reconciliation. She refused to come down and see him and locked herself in a room on the second floor, the door to which he promptly forced. In the meantime she called the radio police and Patrolman Bozman responded. The scene which he witnessed is best described by quoting from his testimony:

"Q. Now, give the conversation that took place in the presence of Mrs. Bonwit, between her husband and herself, the part that you took in it, and the part that Mrs. Lieberman took in it? A. I was invited into the parlor, which is situated to the left as you go in the front door,

and in there was Mr. Bonwit sitting in the parlor. I went in there and Mrs. Bonwit came in, and during the conversation Mr. Bonwit was pleading to his wife to overlook matters that had come up in the past, he was crying and got on his knees and begged and pleaded with her, made her promises, so forth and so on, and after it seemed not to do any good, I talked to Mrs. Bonwit and I asked Mrs. Bonwit about it and she explained to me some trouble they had had—Mr. Bonwit was there—and I guess about fifteen minutes of conversation. Then Mrs. Bonwit showed me her left eye, I think it was, and it was a little blue or something. She said that was caused by Mr. Bonwit in some matters they have had some time before, I don't know just when. I started to talk to Mrs. Bonwit, I thought I was doing right. I asked her was there any cause for anybody to be arrested. She said no, that she did not want anybody arrested, all she wanted was peace. I still stayed, but this other lady—

"Q. Mrs. Lieberman? A. Mrs. Lieberman, she came down the steps there and she called me aside and asked me to take him out, she said, to get rid of him. I said, 'No, I can't do that, this is Mr. Bonwit's home; if Mrs. Bonwit don't order his arrest or order him out, I can't do anything.' Then I asked Mrs. Bonwit again did she want Mr. Bonwit arrested or taken out of the house. She said, 'No, I don't want him arrested, but I would not care if he would leave.' In the meantime, Mr. Bonwit's boy came in. I think from what they said the boy was going gunning or to a rifle range with Mr. Bonwit. He came in and started to cry and he wanted his father, and the little girl came down and she wanted to see her father. Mr. Bonwit grabbed them around the neck and hugged and kissed them like he had not seen them for ten or fifteen years, to my estimation, and Mr. Bonwit was still crying and he left the children and went in the parlor again to Mrs. Bonwit and got on his knees and begged her again. He started to cry, and I thought from all indications that things looked at that time that everything was going to be all right. Mrs. Bonwit was sitting on the settee with

Mr. Bonwit, and Mr. Bonwit had his arms around her and I asked her again, did she care to have Mr. Bonwit arrested or taken out, I wanted to be sure, I didn't know just what the trouble was. She said, no, positively. I said, 'Mrs. Bonwit, I can't do anything unless you order his arrest.' Mr. Bonwit said, 'If she wants me arrested, why arrest me, Officer.' I said, 'No, I can't arrest you, I have heard no disturbance whatever, I can't do anything. It is impossible for me to do anything unless somebody orders your arrest.' He kept begging and pleading with his wife. He said he admits he did wrong, and so forth, and admitted everything pretty near possible and Mrs. Bonwit—he did not deny a thing that Mrs. Bonwit said. They seemed to look like they were congenial and afterwards she stoutly denied she would have anything to do with him. Well, after a while, the boy and he left in the automobile. After I saw him leave, I left."

From this evidence it is at least conceivable that but for the interference of Mrs. Lieberman, who herself had not lived with her husband for two years, the parties would then have effected a reconciliation. The wife appears to have been diligent in providing against the day she would meet her husband in court by preserving in written form an account of these fourteen complaints, nine of which took place before the birth of the youngest child. In addition to this, she produced a copy of a letter which, with the approval of her counsel, she had written her husband when the first child was only two years old, and when on the witness stand she used such written accounts as a basis for her testimony. Such conduct has been characterized by this court as suspicious. *Clark v. Clark*, 162 Md. 699, 159 A. 114.

Therefore, without excusing or attempting to justify the treatment which the husband on many occasions seems to have accorded his wife, we are forced to the conclusion upon the record now before us that her conduct after May 6th, 1934, amounted in law to condonation.

Now were these offenses revived by what took place between them on May 15th, the date of the circus party?

We think not, even assuming they were truthfully characterized by her. To hold otherwise would do violence to the principle that, where the act relied upon to revive condoned offenses was instigated or partly brought about by the other spouse, such condonation remains. *Schouler, Marriage, Divorce and Separation* (6th Ed.) vol. 2, par. 1703; *Nehrbass v. Nehrbass,* 45 App. D. C. 458; *Ann. Cas.* 1918B, page 496, note and cases there cited.

The last annotation includes a citation from *Coles v. Coles,* 32 N. J. Eq. 547, from which we quote: "Had her own conduct been different from what it was, had she herself been free from blame, I would not hesitate to pronounce the desired decree for divorce. But I cannot shut my eyes to the fact that her conduct has been unforgiving and unforbearing, calculated to exasperate rather than conciliate; that she seems to have been unwilling to conform to her husband's wishes in regard to his household affairs, and to discharge her duties under the circumstances in which she was placed."

This rule is founded on justice and supported by reason. In this case, upon the return of the husband from the day's work, because he did not readily assent to attend a party which he had admittedly canceled earlier in the day, he was told by his wife that it was immaterial to her, but she simply was trying to learn if she were going with him or with some one else. It cannot be said that such conduct on her part tended either to cheer or conciliate him. Moreover, she proceeded to attend the party with friends, leaving the tired and worn-out husband to his fate. Subsequently, when he did what he considered the decent thing and attended the party, she complained that he did not speak to her and gave her ugly looks. He had a right to feel that she did not wish to be spoken to by him, and if he did give her ugly looks, such conduct on his part, in view of the treatment she had so recently accorded him, is quite understandable; yet she was as much to blame as the husband for bringing it about. Furthermore, notwithstanding her assertion that she feared to return to the home, we cannot find her apprehensions

in this regard well founded, since, if she really had feared him, it is inconceivable that a few hours earlier she would have taken the attitude which she did with him in regard to attending the party.

For these reasons it must follow that the refusal of the wife to continue the marital relation could not in the legal sense amount to desertion on the part of the husband, and so much of the decree appealed from as divorced her from him *a mensa et thoro* must be reversed, and this likewise applies to that part of the decree which awarded alimony to the wife.

The appeal also questions the correctness of the allowance of a fee of $1,000 to the wife's counsel for services in the case, and while it has been held that, in making such allowance, the financial status of a husband is an element to be considered, the sum so fixed should in no case exceed the amount reasonably necessary to afford the wife adequate representation. In this case conduct of counsel is not subject to the criticism made by Judge Parke in *Silverberg v. Silverberg,* 148 Md. 682, page 693, 130 A. 325, because the record before us is very short and the testimony was taken in one day. However, the court is of the opinion that an allowance of $500 to the wife's solicitor for his services in the court below and in this court would be adequate.

Now as to the remaining part of the decree appealed from, which awarded the custody of the three infant children to the wife, subject to the right of the husband to have one or more of them "at all convenient times": This presents a difficult problem. The father has done nothing to forfeit his right to enjoy their society. He is as much interested in their welfare as is the wife, and it is our earnest hope that by this time both of the parents, as a result of this experience, have learned the lesson of bearing and forbearing, and we see no reason why for the sake of their children alone they should not reunite. However, the father has demonstrated his willingness to provide for the wants of the children, and since he himself seems to feel they should remain together, plus the fur-

ther circumstance that for the time being the father is living in a hotel, we see no reason to disturb this part of the decree, except to say that it should be modified and clarified, so that he may be permitted to have them on such specific dates as the chancellor may find will not interfere with their attendance at school and other duties. Moreover, he should determine for temporary purposes such sum as may be necessary for their needs, retaining jurisdiction in the premises to the end that, unless a reconciliation is effected between the parties within a reasonable time, the husband may be permitted to take such further proceedings as he may deem necessary in regard to their custody.

For these reasons the decree appealed from must be reversed and cause remanded, in order that a decree may be passed in accordance with this opinion.

*Decree reversed, and cause remanded, in order that a decree may be passed in accordance with the opinion of this court; the costs in this court and in the court below to be paid by appellant.*