## ELZEY *v.* ELZEY

[No. 134, October Term, 1948.]

14

*Decided April 1, 1949.*

The cause was argued before DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Frederick P. McBriety,* with whom were *McBriety & Mace* on the brief, for the appellant.

*Calvin L. Brinsfield,* with whom were *Brinsfield & Malkus* on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

Emerson M. Elzey filed a bill of complaint in the Circuit Court for Dorchester County against his wife, Iona

O'Brien Elzey, charging cruelty and excessively vicious conduct, and prayed for a divorce *a mensa et thoro*. The wife answered the bill, denying the allegations thereof; filed a cross bill against her husband, charging cruelty and excessively vicious conduct, prayed for a divorce *a mensa et thoro*, alimony, *pendente lite* and permanent, counsel fees, and a division of personal property. The husband denied the allegations of the cross bill, testimony was taken in open court, the original bill dismissed, and the wife was granted a partial divorce, permanent alimony, and counsel fees. The husband appeals.

These parties were married on September 17, 1943, and finally separated on January 2, 1948. This was the husband's third matrimonial experience, and he has grown children by his previous marriages. This is the wife's second marriage. She has a small boy by her first marriage. There were no children born to these parties. The husband's previous marriages, and the wife's former marriage ended in divorce. The husband was thirty-seven years old when he married his present wife, and she was twenty-three years old. When they married they took the wife's young son to live with them, and the husband seems to have supported and cared for him. The husband was, and is now, a fairly prosperous plumber and employs several men and a lady secretary to work for him. His place of business is on Race Street, Cambridge, Md. He makes a good living, owns a farm of about seventy acres, improved by a house, minus some modern improvements usual in these times. There is a $600 mortgage on this place. He also owns an equity of about $3800 in a house in Cambridge, which he rents to his mother-in-law, Mrs. Wheeler, for $25 a month.

When they were married these people went to live on this farm which is near a settlement called Linkwood, a few miles outside of Cambridge. He drove to his business daily, and his wife came to Cambridge almost every day. They spent a good deal of time in Mrs. Wheeler's home, and went to her house on holidays, where there seems to have been, on such occasions, a family reunion.

16

These people lived a fairly happy life until 1945. In that year the husband went to work for the Phillips Packing Company, in Newark, New Jersey. He evidently stayed there during the week. He came home from Newark on one occasion and as his wife was unpacking his suit case she discovered some contraceptives. She said he told her he found them, and she rather aptly replied: "Emerson, people that find things like that don't pick them up and bring them home." He testified that a friend put them in his pocket as a joke, and he threw them into his top drawer when he got home. The wife said that since that time he has been cool and indifferent to her. This woman is of a highly nervous temperament, and since 1945 she has felt very insecure about her husband.

She was required to go to his office to get a check to defray the weekly expenses of the house. She did not like this, because it exposed to the office force, particularly a lady secretary, their household affairs. When she went there for the check she was impatient, and frequently fussed if her husband didn't immediately cease what he was doing, or stop talking business, and immediately draw her the check. Sometimes she would create a scene, and on one occasion her husband testified, in which he was corroborated by his secretary and others, she hit him with a piece of chrome pipe. There is also evidence, and corroborated, that this happened on another occasion. On neither occasion was the husband hurt. The husband says that she attacked him on many other occasions, which are not corroborated.

In 1945 he and his brother Howard and their wives attended a weekend party given by their aunt at her home outside of Wilmington, Delaware. There evidently was much drinking, for when the wife got in the front seat of the automobile with the husband, she had a drink in her hand. She didn't like some comments made by her husband concerning a young married woman and rebuked him. He then slapped her, and she threw the drink at him, and then the glass, slightly cutting his head.

This occurred while driving along a busy highway.

The wife, at times, demanded to go with her husband when he had business engagements at night. On one occasion she sat in the automobile while a conference was going on in a house, and blew the horn so that she broke up the meeting and demanded that the husband go home. There is a lot of talk about firearms, and on one occasion when the wife pointed a pistol at her husband. These occasions are totally uncorroborated.

This woman testfied that her husband had very little or no night work, but he was continually out at night. She became nervous, underweight, and mentally sick. Her husband left her in the spring of 1947. His wife at that time was being attended by Dr. Hanks, who suggested that she consult a psychiatrist. At that time her husband was living at his aunt's in Cambridge. Dr. Hanks saw the husband and told him that he must go with his wife to Baltimore to see a psychiatrist. He did. The wife says that on the occasion of his leaving her she was "having convulsions with her nerves." After these parties consulted a Baltimore psychiatrist, the husband returned to live with his wife, and she says for the first two or three months they got along very well and then he became indifferent, cool to her, culminating in his leaving on January 2, 1948.

When he left on that occasion he intended never to come back—he so testified. An automobile that his wife was using to come from the farm to Cambridge he got away from her in a very sorry manner. She saw her husband one night as she was going to her mother's home. She went out in her automobile to find him, thinking that she could come up with him and talk to him. He tracked her, in another automobile, and tells of a wild ride into Talbot County. On this occasion he succeeding in having a State Policeman take this automobile from his wife, telling the police that it was a stolen car. He insinuated that there was a man in the car with her. The policeman took the wife to her mother's home after her husband dispossessed her of the car. We are of opinion that there

is not a scintilla of evidence in this case to reflect upon the virtue of this lady.

The husband says that he gave his wife money after the separation, for the purpose of paying over-due bills, and not for support of his wife. He spent the Christmas holidays of 1947 at the home of his mother-in-law, at Cambridge. He slept with his wife, went to a dance with her, and apparently enjoyed himself. He says he did not enjoy himself because his wife quarreled with him. These quarrels could not have been very serious, because no one seems to have noticed them. He says that on Friday, January 2, 1948, his wife kicked up a fuss in his office and that he finally left.

We think that the wife was a nervous, high-tempered and trying woman. He did nothing to help her. His treatment of her was characterized by a calculated, cold indifference, on occasions veneered by an as if kindness. She craved human treatment, which the husband seldom bestowed. Certainly he is not a long-suffering saint. He said he never hit her with his fist, but he did inflict a dark eye one time. He was asked how many times he struck his wife, and he answered: "I couldn't say, to be truthful. It might be five times; six times. But I only did it then to defend myself." He weighs about one hundred and eighty pounds now, but only weighed one hundred and sixty-five when he was living with his wife. He doesn't know what his wife weighs.

His wife stated that he beat her many times. Upon one occasion, in 1945, she said that he blacked both eyes, cut her lip, and blooded her nose. She also said that he frequently twisted her arm. She said this treatment continued throughout her married life. Bruises were seen on her arm, and the occasion when he beat her so badly was corroborated, and he admitted that he did it in self-defense.

The husband states that he is afraid of his wife. We do not think that the evidence supports that he was in a state of fear while he lived with his wife, or that fear of the wife caused him to leave her. After these fusses

and fights the husband and wife lived together as man and wife.

We will not discuss the law applicable to a case like this. It has been stated by this court many times. It is sufficient to repeat what we said in *Collins v. Collins*, 184 Md. 655, at page 662, 42 A. 2d 680, at page 683:

"It is settled law that a single act of violence will ordinarily not justify a divorce on the ground of cruelty; also that marital neglect, indifference, failure to provide as freely as the wife may desire in dress or conveniences, sallies of passion, harshness, rudeness, and use of profane and abusive language do not constitute cruelty as grounds for divorce and that only danger to life, limb, or health will constitute such cruelty. *Short v. Short*, 151 Md. 444, 135 A. 176; *McKane v. McKane*, 152 Md. 515, 137 A. 288; *Wendel v. Wendel*, 154 Md. 11, 139 A. 573; *Brett v. Brett*, 169 Md. 704, 182 A. 305; *Bonwit v. Bonwit*, 169 Md. 189, 181 A. 237; *Faulkner v. Faulkner*, 176 Md. 692, 4 A. 2d 117."

From the evidence, we are of opinion that the husband was not afraid of his wife, nor that she, by her conduct, endangered his life. The Chancellor saw the evidence and we think this evidence justified his conclusion. We think the wife was entitled to relief under the cross bill, and the allowance by the Chancellor for alimony and counsel fees was reasonable.

*Decree affirmed, appellant to pay costs.*