## JOSEPH A. GALVAGNA v. ELEANOR GALVAGNA

[No. 218, September Term, 1970.]

*Decided January 8, 1971.*

The cause was argued before ANDERSON, MORTON, and MOYLAN, JJ.

*Harvey B. Steinberg* for appellant.

*Karl G. Feissner,* with whom were *William L. Kaplan, Thomas P. Smith, Fred R. Joseph,* and *Andrew E. Greenwald* on the brief, for appellee.

ANDERSON, J., delivered the opinion of the Court.

This appeal presents for review a decree of the Circuit

Court for Prince George's County in which the plaintiff-wife was awarded a divorce *a mensa et thoro* and other ancillary relief which is not involved in this appeal. The sole question raised is: Did the trial court err in awarding the plaintiff-wife a divorce *a mensa et thoro* from the defendant-husband?

The husband and wife were married on September 28, 1943, in this State, and have been residents since that date. Four children were born as a result of the marriage, two sons and two daughters, all of whom are now emancipated except the youngest daughter, Janet, who was born November 15, 1954, and who presently resides with her mother.

The wife's bill of complaint was based upon constructive desertion. While she complained in her testimony that her husband had been abusive towards her in the past five years and had failed to adequately support either herself or the two girls and that she lived in constant fear of her husband, her principal grievance centered around his striking her on March 16, 1969. On the night in question the husband had gone to Baltimore on business. He had previously called the house around 6:00 p.m. and told his eldest daughter he would have to go to Baltimore but would return between 11:30 p.m. and 12:30 a.m. He returned home around 12:30 a.m. and found that his wife was not home and that she had gone with friends to North Beach. His eldest daughter, whom he had previously talked with, was not home either. He went upstairs, changed into his pajamas, put his robe on, and came downstairs. The wife came home around 1:30 a.m. but did not converse with her husband. The wife went to her bedroom on the first floor, while the husband went back upstairs. He then returned downstairs to wait for his daughter. According to the wife's testimony the lights were off and she came out of her bedroom and asked her husband why he was "creeping around the house in the dark." The husband replied that he was waiting for their oldest daughter to come home. The wife testified she asked him, after turning on the lights, why he wanted

"to wait for her to frighten her in the dark like that," and she admonished him that that wasn't "any way to wait for a child." The wife told him to stop "creeping around the house like that, that it was frightening me" and returned to her bedroom. She then testified that her husband came over and opened her bedroom door and said, "I bet you had a good time tonight." She said he then struck her across her face and shoulder and threw her around the bedroom. She screamed and this woke her youngest daughter. The husband then left the bedroom. The wife swore out a warrant charging her husband with assault and battery.

According to the husband's testimony he was waiting downstairs for his daughter to return and the wife made repeated trips from her bedroom to say, "What are you waiting for? Why are you waiting for Joanie? You never were interested in Joanie." Finally, his wife called him a s.o.b. and he walked back to her bedroom and told her that she had "better stop this sort of business"; whereupon, she hit him and he struck her on the side of the face with his hand. His wife fell back on the bed and began to scream, and he put his hand on her mouth and told her to stop. His youngest daughter then came into the bedroom and his wife called the police. He called his oldest son and when the police arrived, they all went to the station house where his wife swore out a warrant against him.

The wife testified that after the above incident, she slept in her daughter's bedroom, with the door locked, and after several days left the home and moved into an apartment. The wife admitted that when her husband entered her bedroom on March 16th and struck her, he used his hand and not his fist. She further stated that this was the first time he had ever physically abused her by striking her.

It is apparent from the testimony that the marriage between these parties had been an unhappy one for many years and that on a prior occasion the wife had left her husband but had later returned to him. The wife had a

drinking problem some ten years before she left, and had been a member of Alcoholics Annonymous since then. The testimony discloses that while the wife stated that her husband became quite disagreeable when drinking, his drinking appeared to have been moderate and confined only to weekends. Although the bill of complaint alleges that for a long period of time the defendant-husband had treated the plaintiff-wife in a cruel and inhuman manner by using abusive language, threatening to kill her, calling her vulgar names and making unjust accusations and performing acts too numerous to mention to harass and abuse her, there is no testimony in the record to support such allegations. Indeed, most of the wife's complaints arose over events alleged to have occurred after the separation. She testified that on one occasion, about five months after she left, when she returned to her apartment with a male friend, her husband drove up in his automobile, got out, and physically pushed her friend against the automobile. On another occasion, she testified that she had eight flat tires and that nails had been driven into them or that they had been cut with glass and, also, that someone had poured sand into the gas tank of her automobile. However, there was nothing in the record to indicate that her husband had committed any of these acts, all of which occurred after the separation, and, indeed, the evidence disclosed that the husband had paid off the balance due on the wife's automobile, a 1965 Buick which was in her sole name.

The evidence further disclosed that although requested by the eldest son of the parties, the wife refused to withdraw the warrant for assault and battery against her husband, stating she needed some grounds for the separation. When the case came to trial, it was dismissed after the judge heard the evidence. One of her chief complaints was that her husband did not make enough money to adequately support the family and that his creditors were constantly calling the house and harassing her about payment of bills due them. It is apparent from the husband's testimony that he was involved in serious financial diffi-

culties arising out of his business as a tile setter, but was doing what he could to straighten up his business affairs. At the hearing before the chancellor, the wife's chief witness was her youngest daughter, Janet Galvagna, who testified that on March 16th she was awakened by hearing her mother scream and as she went to her mother's bedroom her father was coming out and her mother was crying and upset and that the bedroom was in some disarray. Her testimony disclosed that the home situation was unpleasant because there was a "lot of screaming and yelling and fighting and arguing between her mother and father." There was further testimony that since the plaintiff-wife had been a member of Alcoholics Annonymous, she went out at least several nights a week to meetings. The wife's only other witness was her doctor, Henry W. Stout, who testified that the wife was disenchanted with her domestic situation and that she suffered from nervousness and tension.

In *Harrison v. Harrison,* 223 Md. 422, 164 A. 2d 901 (1960) at 426, the Court of Appeals, speaking through Judge Prescott, stated: "This Court has repeatedly stated that the law of Maryland does not countenance the separation of husband and wife, except for grave and weighty causes. And it is well settled that, ordinarily, a single act of violence does not constitute cruelty of treatment within the meaning of the law as a cause for divorce *a mensa. Porter v. Porter,* 168 Md. 296, 177 A. 464; *Hastings v. Hastings,* 147 Md. 177, 181, 127 A. 2d 743; *Eberwein v. Eberwein,* 193 Md. 95, 101, 65 A. 2d 792; *Elzey v. Elzey,* 193 Md. 13, 19, 65 A. 2d 563. In order to constitute cruelty of treatment, a single act of violence must indicate an intention to do serious bodily harm, or be of such a nature as to threaten serious danger in the future. *Hastings v. Hastings,* 147 Md. 177, 181, 127 A. 743; *Scheinin v. Scheinin,* 200 Md. 282, 289, 89 A. 2d 609."

In *Murphy v. Murphy,* 248 Md. 455, 459, 237 A. 2d 523 (1967), the Court, speaking through Judge Finan, reiterated the law as laid down in *Harrison v. Harrison, supra,* and pointed out that in *Harrison, supra,* "* * *

[A]lthough the petition was for an *a mensa et thoro* decree, yet the gravamen of the wife's complaint was not cruelty, but constructive desertion, as in the instant case." The Court went on to point out that "Even though the cruelty required in a constructive desertion case may be less than a case wherein an *a mensa* decree is sought on the grounds of cruelty, yet, the objectionable conduct still must be such as to render continuation of the marital relationship impossible, if the complaining spouse is to preserve his or her health, safety or self-respect. *Eberwein, supra.*" See also *Ballan v. Ballan,* 251 Md. 737, 248 A. 2d 871 (1969); *Beavers v. Beavers,* 255 Md. 450, 258 A. 2d 203 (1969); *Liccini v. Liccini,* 255 Md. 462, 258 A. 2d 198 (1969).

We fail to find that the evidence in the instant case, as previously outlined, disclosed an intention on the part of the husband to do his wife serious bodily harm or that it threatened any serious danger to her in the future. The parties had lived together for some 26 years, during a part of which time the wife had a drinking problem which she was able to overcome. During this time only on the occasion in question had the husband struck her.

The chancellor in his oral memorandum awarding the wife a divorce *a mensa* on the ground of constructive desertion based his findings on a "history of abuse" on the part of the husband towards the wife, finally resulting in the "beating" on the night of March 16, 1969. However, the testimony revealed no specific instances of abuse on the part of the husband towards the wife, and we are of the opinion that the chancellor's findings were not justified. We hold that the one act of violence complained of did not constitute cruelty of treatment sufficient to be a ground for a divorce *a mensa,* nor do we find the record to reveal evidence of abuse sufficient to justify the wife living separate and apart from her husband.

We must therefore reverse that part of the decree which granted the wife a divorce; also that part which awarded her the sum of one hundred dollars, per month, as alimony and for the support of the minor child, Janet,

in order that the chancellor may determine what is the proper allowance that should be made for the support of the child. The remaining portions of the decree are affirmed, including the order requiring the appellant to pay three hundred dollars to the appellee as her solicitor's fee.

> *Decree affirmed in part, and reversed in part, and cause remanded for further proceedings not inconsistent with this opinion. The appellant to pay the costs.*