## EGRESS *v.* EGRESS

[No. 161, October Term, 1952.]

[No. 23, October Term, 1953 (Adv.)]

*Decided June 12, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*W. Lee Harrison,* with whom were *Smith and Smith,* on the brief, for appellant.

*Herbert L. Grymes,* for appellee.

SOBELOFF, C. J., delivered the opinion of the Court.

This appeal presents for review the action of the Circuit Court No. 2 of Baltimore City in dismissing a wife's

bill for a decree of divorce *a mensa* on the ground of cruelty and granting such a decree to the husband on his cross-bill based on the wife's alleged desertion.

Alexander and Yolanda Egress lived together from the time of their marriage in April, 1945, until May 21, 1952. Two children were born to them; one is six years of age and the other is five. Temporarily their custody has been awarded to the father, and the mother does not appeal from this order.

While the wife made the broad claim that her husband "started beating on me" shortly after the marriage, she testified to only three episodes. The first was very trivial. On the New Year's Eve following their marriage she was leaving the Lord Baltimore Hotel with her husband and his brother when, she says, "he struck me and pushed me up against the wall saying 'you better leave this man alone' ". The reason, according to the wife, was a fit of jealousy, but the event seemingly did not seriously disrupt the domestic harmony of the couple, for a notation in her diary a few months later, on their first wedding anniversary, characterized their married life as a happy one.

The next assault to which she testified was on February 19, 1952, when it is claimed the husband struck her, but she did not tell anyone about it and admittedly there were no bruises or other evidence.

On May 21, 1952, the only really serious incident occurred. The wife testified that at supper time, when her husband began accusing her of "different things", she left the house and remained away for several hours. The husband's version is that when she returned he asked her where she had been, and she replied, "out with a man, what are you going to do about it?" The wife's story is that he seized a knife, accused her of being out with a man and demanded to know who he was. In her complaint to the police she did not mention the knife. The husband admitted, but tried to minimize, the severity of the assault, saying it was just a slap with his open hand. Accorcding to the wife it was much more

violent, and her claim as to the extent of the beating was corroborated by a physician who saw the bruise marks on her neck, jaw and arms.

Evidently quite aroused, the next morning the husband went to the house of his mother-in-law and declared, "Mom, I must kill Yolanda. She was out with a man". When he returned to his home he found some policemen who had been summoned by the wife. They did not arrest him, but he says that he left the house at their suggestion and his wife's insistence. The husband asserts, and the wife denies, that a cooling-off period of sixty days was agreed to. At all events, he continued to support her and the children, wrote her and made other efforts at reconciliation which she rejected. On the sixtieth day, when he returned, she called the police. Although neither she nor the baby-sitter, who was present, says that the husband caused a disturbance or molested his wife in any way, he was arrested on her orders, taken from his home and lodged in the station house over night.

The wife announced that she would pack her husband's clothes and throw the valise out, and she has resisted his every effort to re-establish the home, and also the advice of her own mother that she should live with her husband. She testified that she is afraid of him and does not want to live with him.

Much of the record relates to what the husband and his witnesses discovered as to the wife's behavior since the separation. Without reciting unnecessary details we state the ultimate facts proven by credible evidence which is only partly and feebly disputed. She was associating quite regularly with a certain man whom she had met where she was formerly employed. On a number of occasions she spent considerable time with him, going to taverns and riding with him in his automobile; and they were seen hugging and kissing each other. This may amount to proof of nothing more than indiscretion on her part, but it suggests that the husband's

suspicions on and before May 21st were probably not utterly without cause.

Even if it were entirely unprovoked and unexplained, the single beating of any consequence as to which there is corroboration falls far short of what the law of this State considers cruelty sufficient for a divorce or justification of the wife in living apart from her husband. *Porter v. Porter,* 168 Md. 296, 177 A. 464; *Hastings v. Hastings,* 147 Md. 177, 127 A. 743, and most recently, *Elzey v. Elzey,* 193 Md. 13, 65 A. 2d 563; *Eberwein v. Eberwein,* 193 Md. 95, 65 A. 2d 792. The record shows, however, that for some months before the separation the wife was neglecting her home and children, associating with the man with whom she formerly worked, and when her husband reproved her she threatened to give him a "hard time". Not unnaturally her conduct created suspicion in the husband's mind and when he voiced his thoughts she taunted him and defied him. The beating was provoked by the wife herself. "Jealousy is the rage of a man", *Proverbs* 6:34.

It is in this framework that the assault and separation are to be viewed, but it is unnecessary to characterize the wife's behavior. It is enough to say that she cannot base a claim for divorce upon it. Manifestly, the desertion here was not by the husband but by the wife who stopped living with him, not because of fear but because she had found a more attractive interest outside the home. The Chancellor's decree was clearly right.

In a separate appeal, argued with the main case, appellant's counsel claimed that the allowances to him of $75 by Chief Judge Smith for his services in the trial court and $150 by Judge Warnken for his services in the appeal are inadequate. While the award of counsel fees is not intended as a penalty on the husband even if he is at fault, it should not be so inadequate as to put the wife at a disadvantage in presenting her case, even if the issue is ultimately determined against her. *Silverberg v. Silverberg,* 151 Md. 152, 134 A. 32; *Tome v. Tome,*

180 Md. 31, 22 A. 2d 549. A counsel fee of Seventy-five dollars ($75.00) is hardly compensatory under present monetary standards considering the incidental preliminary steps and necessary preparation even in a simple contested divorce case. Here the husband is regularly employed and earns Seventy-five dollars ($75.00) per week after withholding tax deductions. We think an award of One hundred and fifty dollars ($150.00) for services in the court below would be more just to the lawyer, without inflicting a hardship on the husband or encouraging an evil like the "alimony racket" discussed in *Waters v. Waters,* 191 Md. 436, 62 A. 2d 250. With this increased allowance, the further allowance of One hundred and fifty dollars ($150.00) made for services on appeal seems not unreasonable in the circumstances of this case.

*Decree affirmed, and allowance of counsel fee modified as indicated, with costs to appellant.*